**UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA**
Alexandria Division

| | |
|---|---|
| **STRATEGIC INNOVATION GROUP, LLC,** ) | |
| 3100 Clarendon Blvd., Suite 200, ) | |
| Arlington, VA 22201 ) | |
| ) | |
| *Plaintiff*, ) | |
| ) | |
| **v.** ) | **Case No.** _____ |
| ) | |
| **SCOPE INFOTECH, INC.,** ) | |
| **Serve:** Michael Lafayette, RA ) | |
| 10160 Staples Mill Rd., Suite 105, ) | |
| Glen Allen, VA 23060 ) | |
| ) | |
| **AVANZ SYSTEMS, INC.,** ) | |
| **Serve:** United States Corporation Agents, Inc., RA, ) | |
| 4445 Corporation Lane, Suite 259, ) | |
| Virginia Beach, VA 23462 ) | |
| ) | |
| **SHERIF SAID,** ) | |
| **Serve:** 41629 Yarrow Ct., ) | |
| Ashburn, VA 20148 ) | |
| ) | |
| **CARLA DAVIS,** ) | |
| **Serve:** 1509 Cleek Ct., ) | |
| Edmond, OK 73025 ) | |
| ) | |
| **MICHELLE BURROWS,** ) | |
| **Serve:** 1530 Shaylee Lane, ) | |
| Choctaw, OK 73020 ) | |
| ) | |
| **MARK TROSPER, JR.,** ) | |
| **Serve:** 18974 E. Indian Hills Rd., ) | |
| Newalla, OK 74857 ) | |
| ) | |
| **SHAUN BARTON,** ) | |
| **Serve:** 12324 Hickory Creek Blvd., ) | |
| Oklahoma City, OK 73170 ) | |
| ) | |
| *Defendants*. ) | |
| ) | |

1

## VERIFIED COMPLAINT

Plaintiff, Strategic Innovation Group, LLC ("SIG"), by counsel, hereby files this Complaint against Defendants Scope Infotech, Inc., ("Scope"), Avanz Systems, Inc., ("Avanz"), Sherif Said ("Said"), Shaun Barton ("Barton"), Michelle Burrows ("Burrows"), Carla Davis ("Davis") and Mark Trosper, Jr., ("Trosper"), and alleges and states as follows:

## INTRODUCTION

1. This dispute arises from the Defendants' conspiracy to misappropriate SIG's trade secrets and tortiously interfere with SIG's contracts and business relationship with the Federal Aviation Administration ("FAA").

2. Said, disgruntled over the loss of control over his former company, following its sale to SIG, agreed and conspired with his brother's company, Scope, and its business partner, Avanz to poach SIG's employees Barton, Burrows, Davis and Trosper (the "Defendant Employees") in order to access SIG's trade secrets and use them to perform the same scope of work on an FAA contract awarded to Avanz.

3. Said, Scope, and Avanz knowingly and intentionally recruited the Defendant Employees, who were bound by restrictive covenants with SIG, for the express purpose of obtaining SIG's Trade Secrets and using them to compete directly with SIG on identical FAA work. After successfully poaching SIG's employees, the Defendants then engaged in a coordinated campaign to interfere with SIG's business relationship and contracts with the FAA, including causing SIG's work and funding to be diverted to Avanz and Scope, disabling SIG's access to critical applications necessary for its work for the FAA, and deleting SIG's proprietary work product and compromising SIG's contract with the FAA.

2

**PARTIES**

4.      SIG is a limited liability company organized under the laws of the Commonwealth of Virginia, with its principal place of business located in Arlington County, Virginia.

5.      SIG is an IT company that supports the federal government with a wide range of services, including but not limited to (1) data systems engineering, (2) artificial intelligence solutions, (3) enterprise architecture services and (4) professional services.

6.      Scope is a stock corporation organized under the laws of the Commonwealth of Virginia, with its principal place of business located at 10420 Little Patuxent Parkway, Suite 550, Columbia, Maryland, 21044.

7.      According to its website, Scope "provide[s] security assessment, vulnerability management, risk assessment, identity and access management, and security consultation services to federal agencies."

8.      Avanz is a stock corporation organized under the laws of the Commonwealth of Virginia, with its principal place of business located at 722 E. Market St., Suite 102-A3, Leesburg, Virginia, 20176.

9.      According to its website, Avanz "is a woman-owned information technology and management consulting firm that helps government organizations select, implement, modernize, integrate and maintain critical end-to-end business solutions."

10.     Said is an individual residing in the Commonwealth of Virginia with a home address of 41629 Yarrow Ct., Ashburn, Virginia 20148.

11.     Davis is an individual residing in the State of Oklahoma with a home address of 1509 Cleek Ct., Edmond, Oklahoma 73025.

3

12. Burrows is an individual residing in the State of Oklahoma with a home address of 1530 Shaylee Lane, Choctaw, Oklahoma 73020.

13. Trosper is an individual residing in the State of Oklahoma with a home address of 18974 E. Indian Hills Rd., Newalla, OK 74857.

14. Barton is an individual residing in the State of Oklahoma with a home address of 12324 Hickory Creek Blvd., Oklahoma City, Oklahoma 73170.

## JURISDICTION AND VENUE

15. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 because this case involves questions of federal law.

16. This Court has supplemental jurisdiction pursuant to 28 U.S.C. § 1367 over SIG's remaining claims because they are so related to the claims in this action within the original jurisdiction of this Court that they form part of the same case or controversy under Article III of the United States Constitution.

17. This Court has personal jurisdiction over Defendants Avanz, Scope, and Said because each is a citizen of the Commonwealth of Virginia.

18. In addition, Said has separately and independently consented to the jurisdiction of this Court pursuant to the contractual agreements which form the basis of SIG's claims against Said.

19. This Court has personal jurisdiction over Defendants Barton, Burrows, Davis and Trosper because each has consented to the jurisdiction of this Court pursuant to the contractual agreements which form the basis of SIG's claims against them.

20. Venue is proper under 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to SIG's claims occurred in the Eastern District of Virginia and because

Defendants Said, Barton, Burrows, Davis and Trosper have consented to venue in the Eastern District of Virginia pursuant to the contractual agreement which forms the basis of SIG's claims against them.

## FACTS

**A. SIG Purchases eSolytics and Acquires eSolytics' Proprietary Information and Contracts with the Federal Aviation Administration.**

21. SIG is a small business government contractor certified under the Small Business Administration's ("SBA") 8(a) program for socially and economically disadvantaged businesses.

22. Shortly after its founding in 2021, SIG acquired 3e Services, a highly respected IT government contractor that performed work on the FAA's Enterprise Information Management ("EIM") system now currently known as Enterprise Data Platform. The EIM system and its Enterprise Data Platform enabled real-time delivery to help optimize and support FAA's enterprise-wide data missions and needs.

23. In 2023, SIG was looking for other opportunities to grow its work at the FAA. SIG came across a growing IT Services and Consulting firm based in Ashburn, Virginia called eSolytics, LLC ("eSolytics"), which held financial services, project management office, and data engineering contracts with the FAA.

24. SIG determined that the work eSolytics was performing with the FAA was related to the work that SIG was performing and presented a promising opportunity for growth.

25. Representatives of SIG met with the two owners of eSolytics, Said and Doug Wilson ("Wilson"), who also determined that it would be beneficial for eSolytics to be acquired by SIG and have a broader range of IT data services that it could provide to the federal government.

26. Accordingly, on May 31, 2023, SIG, Said and Wilson executed a Membership Interest Purchase Agreement ("MIPA") for the purchase of all outstanding shares and membership interests in eSolytics. A true and accurate copy of the MIPA with confidentiality redactions is attached hereto as **Exhibit A**.

27. SIG acquired the membership interests in eSolytics for several million dollars.

28. This was a very significant investment for SIG as a small business. SIG determined the investment was worthwhile due to the valuable intellectual property and government contracts with the FAA that it would acquire from eSolytics.

29. As part of the acquisition of eSolytics, SIG purchased eSolytics' goodwill and intellectual property, including *inter alia* all of its trade secrets, know-how, technology, and confidential and proprietary information. Exhibit A, § 3.11.

30. The intellectual property acquired from eSolytics can be generally described as: (i) its knowledge of how to identify, interpret and use its customer's data to maximize utility; (ii) its unique Standard Query Language Code ("SQL Code") used to create proprietary workflows[1] to automate extraction, processing, and transformation of its customers' data; (iii) its proprietary data visualizations used to display, validate, and report on customer data; and the specialized know-how required to create, operate, and maintain these workflows and visualizations to process customer data and create reports (collectively, the "SIG Trade Secrets").

31. The SIG Trade Secrets derive independent economic value, both actual and potential, from not being generally known to, and not being readily ascertainable through proper means by, other persons or entities who can obtain economic value from their disclosure or use.

---

[1] A workflow is a structured, repeatable sequence of steps, tasks, or actions that move a piece of work from initiation to completion.

32.     The SIG Trade Secrets are stored on a secure SharePoint site with restricted access. Only a limited number of authorized SIG employees performing work for SIG's FAA contracts are granted permission to access the SIG Trade Secrets.

33.     To this day, the SIG Trade Secrets are stored in a dedicated secure SharePoint repository with privileged access as described above.

34.     When SIG acquired eSolytics, it assumed eSolytics' federal government contracts, including work performed for the FAA.

35.     This included work performed pursuant to a Master Subcontract Agreement with Ernst & Young to support the FAA's Office of Finance and Management ("AFN") Director of Acquisition and Business Services ("ACQ-002"), Contract No. 693KA9-19-D-00004, Task Order No. 693KA9-23-F-00029 ("Task Order 29").

36.     Said served as the Project Manager on Task Order 29 while at eSolytics. He agreed to continue to work in that capacity for SIG after the acquisition of eSolytics and became a Vice President of SIG.

37.     SIG's employees, including Said, used the SIG Trade Secrets in the performance of Task Order 29 to identify the relevant FAA data and create the workflows needed to process, analyze and summarize data for the FAA.

**B. Said Executes Non-Disclosure, Non-Competition and Non-Solicitation Agreements with SIG.**

38.     To protect the intellectual property and goodwill it purchased, including the SIG Trade Secrets, SIG included nondisclosure, noncompetition and non-solicitation provisions in the MIPA.

39.    Under the MIPA, Said agreed to "hold in confidence any and all information, in any form, concerning [SIG] or [eSolytics]," with limited exceptions not applicable here. Exhibit A, § 5.01.

40.    Said further agreed that for a period of three years from the execution of the MIPA, he would not "engage in or assist others in engaging in Prohibited Activity [defined below] in the United States" or "interfere in any material respect with the business relationships (whether formed prior to or after the date of this Agreement) between [SIG] or [eSolytics] and its customers or suppliers." Exhibit A, § 5.02(a) (emphasis added).

41.    The MIPA defines "Prohibited Activity" as:

[A]n activity in which [Said or Wilson] contributes knowledge, directly or indirectly, in whole or in part, as an employee, employer, owner, operator, manager, advisor, consultant, agent, employee, partner, director, stockholder, officer, volunteer, intern, or any other similar capacity to an entity engaged in the business of government contracting that is (i) defined as a Small Business under the Federal Acquisition Regulations or (ii) deriving a material composition of its revenue from any NAICS Code [SIG[2]] intends to do business or actively does business in. ***Prohibited Activity also includes activity that may require or inevitably requires disclosure of trade secrets, proprietary information, or Confidential Information.***

Exhibit A, § 5.02(a) (emphasis added).

42.    Said also agreed not to solicit directly or indirectly any current or former employee of SIG or eSolytics for a period of three years following execution of the MIPA. Exhibit A, § 5.02(b).

43.    The MIPA further provides that a violation of the non-competition and non-solicitation provisions "would give rise to irreparable harm to [SIG], for which monetary damages would not be an adequate remedy" and SIG would "be entitled to equitable relief, including

---

[2] Pursuant to the MIPA, eSolytics merged with SIG and "all such obligations [under the Agreement] shall equally apply to Buyer as though Buyer was Company."

temporary restraining order, an injunction, specific performance, and any other relief that may be available from a court of competent jurisdiction (without any requirement to post bond)." Exhibit A, § 5.02 (c).

44.     The MIPA also requires Said to indemnify SIG for "any and all Losses incurred or sustained by, or imposed upon, [SIG] based upon, arising out of, with respect to, or by reason of… any breach or non-fulfillment of any covenant, agreement, or obligation to be performed by Seller pursuant to [the MIPA] or the other Transaction Documents." Exhibit A, § 7.01(b).

45.     As part of his employment with SIG, Said also executed an Executive Employment Agreement ("EEA"). A true and accurate copy of the EEA with confidentiality redactions is attached hereto as **Exhibit B**.

46.     Under the terms of the EEA, Said agreed that for the duration of his employment, and for twenty-four months following the end of his employment with SIG, he would not engage in "Prohibited Activity," as defined in the EEA. Exhibit B, § 8.2 (emphasis added).

47.     The EEA defines "Prohibited Activity" as:

> Activity which [Said] contributes [Said's] knowledge, directly or indirectly, in whole or in part, as an employer, owner, operator, manager of a LLC or similar entity, partner, director, stockholder, or any other similar capacity to an entity engaged in the business of government contracting that is (i) defined as a Small Business under the Federal Acquisition Regulations or (ii) deriving a material composition of its revenue from any NAICS Code [SIG] intends to do business or actively does business in. ***Prohibited Activity also includes activity that may require or inevitably requires disclosure of trade secrets, proprietary information, or Confidential Information***."

Exhibit B, § 8.2 (emphasis added).

48.     The EEA defines "Confidential Information" as "all information not generally known to the public, in spoken, printed, electronic or any other form or medium, relating directly or indirectly to: business processes, practices, methods, policies, plans, publications, documents

…techniques, … ***know-how, trade secrets, computer programs, computer software, applications***…" among other things. Exhibit B, § 7.1 (emphasis added).

49.     Said also agreed "not to directly or indirectly solicit, hire, recruit, attempt to hire or recruit, or induce the termination of employment of any employee of [SIG], or attempt to do so, during five (5) years, to run consecutively, beginning on the last day of [Said's] employment with [SIG]. Exhibit B, § 8.3.

50.     Under the EEA, Said was obligated to "(i) provide or return to [SIG] any and all [SIG] property, including keys, key cards, access cards, identification cards… and data and all [SIG] documents and materials belonging to [SIG] and stored in any fashion, including but not limited to those that constitute or contain any Confidential Information or Work Product, that are in the possession or control of [Said]… and (ii) delete or destroy all copies of any such documents and materials not returned to the Company that remain in [Said's] possession or control, including those stored on any non-[SIG] devices, networks, storage locations, and media in [Said's] possession or control." Exhibit B, § 14.2.

51.     Said also agreed that for five years from the last day of his employment with SIG that he would not "directly or indirectly solicit, contact… attempt to contact, or meet with [SIG's] current, former or prospective customers for purposes of offering or accepting goods or services similar to or competitive with those offered by [SIG]." Exhibit B, § 8.4.

52.     Said further understood and acknowledged that "loss of this customer relationship and/or goodwill will cause significant and irreparable harm." Exhibit B, § 8.4.

**C. Barton, Burrows, Davis and Trosper Join SIG and Execute Non-Disclosure, Non-Competition and Non-Solicitation Agreements.**

53.    All former eSolytics employees who transitioned to SIG, and new SIG employees, were required to execute Employee Proprietary Information, Works for Hire, Non-Competition, Non-Disparagement and Non-Solicitation Agreements ("Employment Agreements").

54.    Barton, Davis and Trosper were among the former eSolytics employees who transitioned to SIG. Barton later assisted with recruiting Burrows, who joined SIG in 2024. The Employment Agreements for Barton, Burrows, Davis and Trosper (collectively the "Defendant Employees") are attached hereto as **Exhibits C, D, E and F**.

55.    Each Employment Agreement contains a Nondisclosure provision wherein the Defendant Employees agreed "at all times during my employment and thereafter, I will hold in strictest confidence and will not disclose, use or publish any of the Company's . . . Confidential Information (defined below) or Proprietary Information (defined below). Exhibits C-F, § 1.1.

56.    Proprietary Information is defined as follows:

"Proprietary Information" means ***any and all confidential and/or proprietary knowledge, data or information of the Company***, its affiliates, or it parents and subsidiaries, or customers or third persons where such customers or third persons shared such information under condition of confidentiality. By way of illustration but not limitation, ***Proprietary Information includes (a) trade secrets, inventions, mask works, ideas, processes, formulas, source and object codes, data, programs, other works of authorship, know-how, improvements, discoveries, developments, designs and techniques (hereinafter collectively referred to as "Inventions")***; . . . (c) information regarding Customers or Potential Customers (defined below in Section 4), including names and their representatives, their needs or desires with respect to the types of products or services offered by the Company, proposals, bids, contracts and their contents and parties, the type and quantity of products and services provided or sought to be provided to Customers or Potential Customers, and other non-public information relating to Customers or Potential Customers; (d) information regarding any of the Company's vendors or business partners and their services, including their names and their representatives, proposals, bids, contracts and their contents and parties, the type and quantity of products and services received by the Company, and other non-public information relating to business

partners; and (e) *any non-public information that a competitor of the Company could use to the competitive disadvantage of the Company.*

Exhibits C-F, § 1.2 (emphasis added).

57.    The Defendant Employees also agreed that their "obligation to maintain confidentiality continues (i) after the termination of this Agreement, and (ii) after the completion, termination or expiration of my employment with the Company." Exhibits C-F, § 1.4.

58.    The Employment Agreements each contain a noncompete/non-solicitation provision which states that the employee will not:

Solicit, *perform or attempt to perform, or hold myself out as being available to perform any Conflicting Services for a current Customer*… or for any consultant, business partner, or contractor of [SIG] with whom I had direct or indirect contract or whose identity I learned as a result of my employment with [SIG]…

Exhibits C-F, § 4.4 (emphasis added).

59.    The Defendant Employees also agreed not to:

Authorize or *permit any competitor of [SIG] to represent to* any third person or *government agency* or contracting authority that *I am available to work for the competitor for any work for which [SIG] is currently performing or for which both the competitor and [SIG] are competing*, are proposing to compete, or have competed within the twelve-month period immediately preceding such contact, solicitation, authorization, or permission.

Exhibits C-F, § 4.5 (emphasis added).

60.    Further, the Defendant Employees also agreed to a Return of Company Documents and Property provision, which states:

When my employment or other engagement with the Company ends for any reason, whether voluntarily or involuntarily, I will deliver to the Company on or before the second day following my separation date, and will not retain or copy, any and all drawings, notes, memoranda, specifications, electronic media, devices, formulas, property of the Company, and documents, together with all copies thereof, and any other material containing or disclosing any Company Proprietary Information of the Company. Upon my voluntary or involuntary separation from employment or other engagement with the Company, *I agree that I will not alter, delete, or amend any electronic media, files or data of [SIG] without the written consent of an*

12

*officer of [SIG]*. Prior to leaving employment or other engagement with the Company, ***I will provide the Company with a list of all applicable passwords, keys and security codes necessary to access any programs, applications, software, files, media, or electronic or physical storage***.

Exhibits C-F, § 7 (emphasis added).

61.     The Employment Agreements further provide:

[A]ny threatened or actual violation of this Agreement or any of its terms will constitute immediate and irreparable injury to the Company and the Company shall have the right to enforce this Agreement and any of its provisions by injunction, specific performance or other equitable relief, without bond and without prejudice to any other rights and remedies that the Company may have for a breach or threatened breach of this Agreement or of any other agreement between me and the Company.

Exhibits C-F, § 10.1.

62.     The Employment Agreements also provide for the award of attorneys' fees to the substantially prevailing party. Exhibits C-F, § 10.2.

63.     The Defendant Employees also agreed that should SIG enforce the terms of the Employment Agreement through arbitration or court order, their respective non-competes would be effective for two years from the date of their separation with SIG, not including the period of time for which they were in breach. Exhibits C-F, § 10.3.

**D. SIG is Awarded a Contract with the FAA to Continue the Work it Performed Under Task Order 29.**

64.     eSolytics began work on Task Order 29 in March 2023. Post-acquisition, SIG continued this work through March 2025. The FAA exercised all option periods on Task Order 29. However, due to budget cuts by DOGE, the final option period was not exercised.

65.     To enable SIG to continue the highly specialized work that it was performing under Task Order 29, the FAA issued a direct award to SIG pursuant to the SBA's 8(a) program.

66.     On May 7, 2025, SIG was awarded a Prime Contract with the FAA, known as ACQ Data Analysis and Reporting, bearing Prime Contract Number 6973GH-25-D-00043 (the "ACQ Data Contract"), which is an IDIQ[3] contract with an expected ceiling of $4.5 million.

67.     The ACQ Data Contract was awarded to SIG after the period of performance for Task Order 29 concluded. The scope of work on the ACQ Data Contract was a continuation of the work that SIG was performing on Task Order 29.

68.     The period of performance for the ACQ Data Contract is expected to be sixty (60) months from the date of award, with a Base Period from May 7, 2025 to May 6, 2026 and four Option Periods running until May 6, 2030.

69.     The purpose of the ACQ Data Contract is to, *inter alia*, provide system integration, workflow automation and data analytics to the FAA's Office of Finance and Management ("AFN") Director of Acquisition and Business Services ("ACQ-002"), which is a continuation of the work SIG was performing under Task Order 29.

70.     The Defendant Employees started performance on the ACQ Data Contract in May of 2025.

71.     As part of their work on the ACQ Data Contract, the Defendant Employees were provided access to the SIG Trade Secrets, which were required to create the workflows needed to process, analyze and summarize data for the FAA.

---

[3] IDIQ stands for indefinite delivery, indefinite quantity contract. IDIQ contracts are typically used for an indefinite quantity of services for a fixed period of time. They are used when the government customer cannot determine, above a specified minimum, the precise quantities of supplies or services that the government will require during the contract period.

72.     The Defendant Employees previously had access to the SIG Trade Secrets through their work on Task Order 29 and used them in substantially the same way on the ACQ Data Contract.

73.     Due to the sensitive nature of the data being processed, SIG was required to perform its work on the ACQ Data Contract on FAA furnished computers.

74.     Additionally, the FAA provided SIG with access to a number of applications, including but not limited to, Alteryx and Tableau, within which SIG could perform the work required under the ACQ Data Contract. Alteryx is used to create workflows to automate the processing of data. Tableau is used to present the data processed by SIG.

### E. Said Leaves SIG and Conspires with Scope and Avanz to Interfere with SIG's FAA Contracts and Poach SIG's Employees.

75.     As a Vice President for SIG, Said was aware of SIG's business and contractual relationship with the FAA.

76.     Said also had extensive knowledge of SIG's Trade Secrets as SIG's Project Manager on Task Order 29. During his tenure at SIG, Said had direct access to SIG's proprietary SQL Code, Alteryx workflows, and Tableau dashboards and datasets used to perform SIG's work for the FAA on Task Order 29.

77.     Even though he received millions of dollars from SIG for the purchase of eSolytics and became a Vice President of SIG with a generous salary, Said was not satisfied with the bargain he struck.

78.     In fact, Said wrote a book in which he expressed his disappointment over his loss of control over eSolytics' business operations and brand.

79.     Once it became clear to Said that he was no longer in control of eSolytics' business following its acquisition by SIG, he decided to leave SIG.

80.     On August 5, 2024, Said advised SIG that he would be leaving the company. In anticipation of needing to fill Said's position as Project Manager on Task Order 29, SIG began the process of identifying Said's replacement.

81.     Said left SIG on September 6, 2024. As part of the offboarding process, Said attended a meeting with SIG's Chief Operating Officer and Business Operations Manager where he was reminded of his nondisclosure, non-competition and non-solicitation obligations under the MIPA and EEA.

82.     The weekend after his employment concluded, Said emailed SIG's CEO, requesting to be hired as a 1099 contractor, stating that he would help SIG obtain a contract with the FAA. SIG declined Said's request.

83.     Shortly after Said's departure, SIG was informed that it would not be permitted to fill the Project Manager position on Task Order 29 and that its funding on Task Order 29 was reduced by approximately $250,000, which would cover the cost of Said's position.

84.     Said joined Scope in or about September of 2024. Said's brother, Hytham Said, is the Chief Growth Officer and an owner of Scope.

85.     Upon information and belief, the funding on Task Order 29 for the Project Manager position was transferred to Scope and/or Said through a prime or subcontract. This transfer occurred shortly after Said's departure from SIG and his commencement of employment with Scope.

86.     Upon information and belief, Said used SIG's Trade Secrets and customer information to help Scope win work as a prime or subcontractor on Task Order 29.

87. After the conclusion of the period of performance for Task Order 29, the FAA changed its acquisition strategy to a direct award to a small business certified under the SBA's 8(a) program.

88. Said's employer, Scope, did not possess an 8(a) certification. However, Scope knew of a company that was 8(a) certified that had worked for the FAA as a subcontractor—Avanz.

89. Upon information and belief, Said used SIG's customer information and the SIG Trade Secrets to convince the FAA to issue a direct award to Avanz for work that was nearly identical to the work for the ACQ Data Contract.

90. Unbeknownst to SIG, on May 8, 2025, one day after SIG was awarded the ACQ Data Contract, Avanz also received a direct award from the FAA, pursuant to the SBA's 8(a) program (Contract No. 6973GH-25-D-00044) with a $4.3 million ceiling (the "Avanz Contract").

91. The Avanz Contract has an identical mission and scope of work to SIG's ACQ Data Contract. Both contracts are tasked with providing system integration and data analytics to assist the FAA in its administration of its contracts.

92. The timing of the Avanz Contract award—one day after SIG's ACQ Data Contract award—and the immediate subcontracting arrangement with Scope demonstrate that Avanz and Scope had pre-positioned themselves to compete directly with SIG using SIG's Trade Secrets.

93. At the time Avanz was awarded the Avanz Contract, Scope did not qualify for an 8(a) award. Thus, Scope received a Subcontract from Avanz, which enabled Said to perform the same work for the FAA that he previously performed as SIG's Project Manager for Task Order 29, in direct violation of his covenants in the MIPA and EEA.

94. Upon information and belief, at the time that Avanz was awarded the Avanz Contract, it had never been awarded a prime contract with the FAA.

95.    In May of 2025, Avanz announced the award of its contract with the FAA on LinkedIn.

96.    Avanz's CEO and Founder, Amrita Singh, reposted Avanz's announcement, writing "So proud of Avanz team with specially mention to our friend [sic] at Scope Infotech, Inc. We're looking forward to achieving great things together and making a positive impact. Here's to a bright future and continued success!"

97.    As Fall 2025 approached, unaware of the Avanz Contract, and receiving positive feedback on its work under the ACQ Data Contract, SIG was confident that its contract would be renewed for the first option year.

98.    However, Said, seeking to benefit himself and his brother's company, and with knowledge of SIG's Trade Secrets and customer information was engaging in a concerted effort to interfere with SIG's contracts and business opportunities and to misappropriate SIG's Trade Secrets for the benefit of Scope and Avanz.

99.    In mid-2025, unknown to SIG at the time, an opportunity for it to provide Artificial Intelligence ("AI") services to the FAA arose. Under the mistaken belief that Said was SIG's representative, the FAA's representative reached out to Said to discuss the potential opportunity.

100.    In response, Said told the FAA's representative that SIG did not provide AI services. This statement was untrue at the time it was made by Said. The contract to provide AI services to the FAA was then awarded to a different company.

101.    Said directly solicited SIG's employees to leave SIG to go work with him for a direct competitor of SIG—Scope and/or Avanz.

102.    Said's solicitation included hosting an in-person meeting with Barton, Davis, and Trosper at an Oklahoma City Thunder basketball game in or around December 2025, during which,

18

upon information and belief, Said encouraged them to resign from SIG and join Scope to perform work on the Avanz Contract using SIG's Trade Secrets.

103.    SIG did not learn that Said had attended this game with Barton, Davis and Trosper until it discovered a photograph of them at the game posted by Said in January of 2026. In the three months following their attendance at the basketball game, Barton, Davis and Trosper resigned from SIG.

**F. The Defendant Employees Resign from SIG and Actively Obstruct SIG's Transition of Work on the ACQ Data Contract.**

104.    On December 11, 2025, SIG received an employment verification request from Scope's Human Resources department for Barton.

105.    On December 12, 2025, Barton resigned from his position with SIG.

106.    Barton advised SIG that his FAA badge and FAA issued computer—which contained his credentials required to access SIG's Trade Secrets, Alteryx workflows, Tableau database and other applications—would not be returned to SIG for use by Barton's replacement.

107.    Rather, Barton took the FAA equipment with him and claimed he would use the same equipment with his new employer.

108.    In violation of his Employment Agreement, Barton failed to provide SIG with a list of all applicable passwords, keys and security codes necessary to access any programs, applications, software, files, media, or electronic or physical storage. Further, Barton obstructed SIG's efforts to obtain credentials for his successor to access the FAA applications.

109.    Barton refused to tell SIG the identity of his new employer.

110.    On June 1, 2026, Scope, through its counsel, confirmed that Barton is employed by Scope.

111. On February 17, 2026, Trosper gave notice of his resignation from his position at SIG.

112. Trosper told SIG that a once-in-a-lifetime opportunity had landed in his lap which he could not pass up but refused to provide the name of his new employer.

113. On June 1, 2026, Scope, through its counsel, confirmed that Trosper is employed by Scope.

114. When Trosper notified SIG of his resignation, he agreed to provide SIG with transition support.

115. This agreement was short-lived. Each time SIG tried to schedule a transition meeting with SIG's incoming team leads, Trosper declined to meet, stating that he was too busy.

116. When Trosper finally met with SIG's incoming team leads, he only provided SIG with a one-page list of daily use systems but failed to provide SIG with critical information needed to run certain Alteryx workflows.

117. Then, on February 27, 2026, the last day of his employment with SIG, Trosper reneged on his offer to provide transition support and advised SIG that he would not assist with knowledge transition.

118. In violation of his Employment Agreement, Trosper failed to provide SIG with a list of all applicable passwords, keys and security codes necessary to access any programs, applications, software, files, media, or electronic or physical storage.

119. He also refused to turn in his FAA laptop to SIG for use by his replacement. Instead, he took the FAA laptop, which contained the credentials he needed to access SIG's Trade Secrets, Alteryx workflows, Tableau database and other applications, to his new employer. Further, Trosper obstructed SIG's efforts to obtain credentials for his successor to access the FAA applications.

120. That same day, February 27, 2026, Burrows and Davis also provided SIG with their respective notices of resignation, stating that their last day of employment would be March 13, 2026.

121. Burrows and Davis also refused to share the name of their new employer.

122. On June 1, 2026, Scope, through its counsel, confirmed that Burrows and Davis are employed by Scope.

123. SIG worked expeditiously to hire individuals to replace the Defendant Employees to ensure continuity of service on the ACQ Data Contract.

124. Between February 13, 2026, and March 13, 2026, Burrows, Davis and Trosper engaged in obstructive behavior, refusing to provide necessary transition support to SIG's incoming ACQ Data Contract team.

125. For example, on February 25, 2026, Trosper, Davis and Burrows had a call with SIG's new employees on the ACQ Data Contract ostensibly to complete the knowledge transfer. However, they refused to show any of the SIG employees information within the FAA environment, which is necessary for the knowledge transfer. Further, they provided an incomplete list of systems used to support the ACQ Data Contract and failed to provide the information needed for the new SIG employees to access the systems and run all necessary Alteryx workflows.

126. Repeated attempts by SIG's Vice President of Technology to meet with Davis and Burrows to discuss their transition out of the company were rejected.

127. SIG's requests that Burrows and Davis provide information needed for adequate knowledge transfer were also rejected, with Burrows and Davis erroneously directing SIG to review the documents contained within SIG's shared drive, which was not sufficient.

128. The new SIG employees needed access credentials to the FAA systems and workflows that Burrows and Davis previously used under the ACQ Data Contract, but Burrows and Davis would not provide the new SIG employees with the information required to obtain this access.

129. Burrows and Davis also refused to answer certain questions falsely claiming that SIG's questions were not relevant to SIG's scope of work.

130. On March 12, 2026, one of SIG's new employees was granted access to the FAA systems used to perform the ACQ Data Contract. Davis and Burrows refused to meet with the new employee since their last day was March 13, 2026. Even on their last day, Davis and Burrows said it was too late in the day for them to pull together the documents requested or to meet with SIG's new employees on the ACQ Data Contract.

131. Further, Davis and Burrows did not return to SIG their FAA issued computers that they used to perform the ACQ Data Contract which contained their respective credentials required to access SIG's Trade Secrets, Alteryx workflows, Tableau database and other applications.

132. In violation of her Employment Agreement, Burrows failed to provide SIG with a list of all applicable passwords, keys and security codes necessary to access any programs, applications, software, files, media, or electronic or physical storage. Further, Burrows obstructed SIG's efforts to obtain credentials for her successor to access the FAA applications.

133. In violation of her Employment Agreement, Davis failed to provide SIG with a list of all applicable passwords, keys and security codes necessary to access any programs, applications, software, files, media, or electronic or physical storage. Further, Davis obstructed SIG's efforts to obtain credentials for her successor to access the FAA applications.

134.    Upon information and belief, the retention of their FAA issued computers facilitated Barton, Burrows, Davis and Trosper's continued access to and use of SIG's Trade Secrets.

135.    On June 1, 2026, Scope, through its counsel, confirmed that the Defendant Employees are employed by Scope. On information and belief, Scope hired the Defendant Employees to perform the same services they performed for SIG on the ACQ Data Contract under Scope's Subcontract to the Avanz Contract.

### G.  The Defendants Prevent SIG from Accessing Workflows Needed to Perform the ACQ Data Contract.

136.    On March 17, 2026, SIG learned that Said was working as the Program Manager ("PM") for the Avanz Contract.

137.    Curiously, the FAA further informed SIG that Said would also serve as the PM on the ACQ Data Contract.

138.    On information and belief, Said used the SIG Trade Secrets and/or SIG's customer contacts to convince the FAA to make him the PM on both the ACQ Data Contract and the Avanz Contract.

139.    That same day, a SIG employee, understanding that Said was the PM for both the Avanz and ACQ Data Contracts, requested that Said provide him with the handover files (which Burrows and Davis had refused to provide) needed to complete certain tasks assigned to him by Said. Said responded that the handover files had been shared by Burrows and Davis through a shared access drive prior to their departure from SIG, which was false.

140.    Additionally, it took SIG over two weeks to obtain access to the over one hundred ninety (190) Alteryx workflows, including workflows created by the Defendant Employees on Task Order 29 and under the ACQ Data Contract, needed to perform its work on the ACQ Data Contract.

141.    This two-week delay was caused by Said, who under the guise of his authority as PM of the Avanz and ACQ Data Contracts stalled in providing SIG with complete access to all Alteryx workflows.

142.    Initially, Said only provided access to twenty-three (23) of the over one hundred ninety (190) workflows and erroneously maintained that SIG had access to everything.

143.    A few days later, Said provided SIG with access to an additional seventy-two (72) workflows but incorrectly maintained that SIG did not need access to the full suite of workflows to perform its work under the ACQ Data Contract.

144.    In addition to refusing to provide SIG with full and complete access to the Alteryx workflows, Said, again purporting to act under his authority as the PM for both the Avanz and ACQ Data Contracts, tried to alter the scope of SIG's work under the ACQ Data Contract.

145.    For example, when SIG attempted to perform a task that fell within its scope of work under the ACQ Data Contract, Said told SIG that the task was not within its scope of work and was to be handled by his (Said) subject matter experts.

146.    SIG was later told by its customer representative that Said was incorrect, and that the task in dispute was to be performed by SIG.

147.    On March 23, 2026, SIG learned that Said had solicited a SIG customer to find some additional work for Burrows and Davis on an FAA contract vehicle.

## H.  The Defendants Ignore SIG's Cease and Desist Letters, Continue to Interfere with the ACQ Data Contract and Delete SIG's ACQ Contract Data.

148.    On April 13, 2026, SIG sent Said a cease-and-desist letter which demanded that Said, "cease and desist from conduct that breaches the restrictive covenants and related obligations you owe to SIG, including prohibited competition, solicitation and poaching of SIG personnel, interference with SIG's customer and supplier relationships, misappropriation of any of SIG's trade

24

secrets or other intellectual property, and diversion of SIG work and business opportunities."

**Exhibit G**, Ltr. from T. Reinecker to S. Said (April 13, 2026) (attachments omitted).

149.     Said refused to cease and desist from his wrongful conduct after receiving this letter from SIG's counsel.

150.     The next day on April 14, 2026, SIG discovered that its Alteryx workflows were disabled.

151.     The disabling of these workflows and data connections prevented SIG from performing its mission for the FAA under the ACQ Data Contract.

152.     When SIG first reported the disablement of its Alteryx workflows and Tableau data connections, SIG was told that the disablement was caused by the expiration of user credentials. The reference was to the former teams' user credentials required to access the data sources referenced by the Alteryx workflows and Tableau dashboards. This was untrue.

153.     The expiration of a user authorization does not automatically cause Alteryx workflows to be disabled.

154.     SIG's investigation confirmed that the workflows had been manually disabled by an Alteryx user—specifically, one or all of the Defendant Employees.

155.     All of SIG's workflows were reflected in Alteryx as "owned" by Barton, Burrows, Davis and Trosper, as they were created by the Defendant Employees during the course of their employment with eSolytics on Task Order 29 and with SIG under the ACQ Data Contract. Only the Defendant Employees, using their retained FAA-issued computers with stored credentials, had the technical ability to disable these workflows.

25

156.    On April 15, 2026, SIG sent the Defendant Employees cease and desist letters. The cease-and-desist letters demanded, *inter alia,* that Barton, Burrows, Davis and Trosper, respectively:

> immediately cease and desist from all conduct that violates your [Employment] Agreement, and any and all other legal obligations that you owe the Company. This includes performing, or holding yourself out as available to perform, same or similar services for any SIG customer or potential customer with whom you had contact or about whom you learned during your SIG employment.

**Exhibits H**, **I**, **J** and **K**, Ltr. from T. Reinecker to Barton, Burrows, Davis and Trosper, respectively (April 15, 2026) (attachments omitted).

157.    The Defendant Employees refused to cease and desist from their wrongful conduct after receiving letters from SIG's counsel.

158.    On or about April 20, 2026, SIG's customer representative directed SIG to reach out to Avanz to obtain the information the Defendant Employees refused to provide to SIG's new employees prior to their departure from SIG.

159.    Between April 22-24, 2026, Trosper refused to provide SIG with information that the government customer directed Trosper to provide. Over the course of two days, Trosper ignored repeated requests from SIG for the information it needed to perform its work on the ACQ Data Contract and also refused to meet with SIG.

160.    On April 23, 2026, Avanz stated it would only agree to make the Defendant Employees available to SIG for the purpose of obtaining transition information if SIG would agree not to pursue any legal or adverse action against the Defendant Employees or Avanz.

161.    On May 4, 2026, Davis deleted multiple of SIG's Tableau dashboards from the FAA's systems between approximately 9:54 a.m. and 10:00 a.m. that morning. These Tableau

26

dashboards were critical for daily data validation required under the ACQ Data Contract. The dashboards could not be recovered by SIG.

162. At the time Davis deleted SIG's Tableau dashboards, the Defendant Employees continued to have access to SIG's Alteryx workflows, Tableau dashboards, development databases and SIG Trade Secrets through the credentials stored on their retained FAA-issued computers.

163. Later that day, on May 4, 2026, SIG sent Scope and Avanz cease and desist letters, which demanded that Scope and Avanz:

> a. ***Immediately cease and desist*** from obstructing SIG's ability to perform the ACQ Data Contract, and provide SIG with access to all Alteryx workflows necessary for the work under ACQ Data Contract. . .
>
> b. ***Immediately cease and desist*** from any use of SIG's SQL code, and all Alteryx workflows developed under the SIG ACQ Data Contract; immediately restore and transfer all such work product back to SIG and confirm in writing within 5 days of receipt of this letter that it has deleted all references to said code from its systems.
>
> c. ***Immediately cease and desist*** from assigning Sherif any work on the Scope Subcontract supporting the Avanz Contract, which violates the restrictive covenants set forth in his MIPA and Employment Agreement.
>
> d. ***Immediately cease and desist*** from destroying all SIG work product on the ACQ Data Contract, including but not limited to dashboards, workflows, data connections, databases, servers, data files, etc. To the extent that Scope is in possession of such SIG work product, immediately restore and transfer all such work product back to SIG and confirm in writing within 5 days of receipt of this letter that it has deleted all references to said code from its systems.

True and accurate copies of the cease and desist letters with confidentiality redactions are attached hereto as **Exhibits L** and **M** (attachments omitted), respectively.

164. Neither Scope nor Avanz complied with SIG's demands in the cease-and-desist letters.

27

165.    SIG has requested that all individuals connected to Avanz or Scope be denied access to its proprietary Alteryx workflows, Tableau dashboards and the SIG Trade Secrets.

166.    In performing work on the Avanz Contract, the Defendant Employees and Said have used and continue to use SIG's Trade Secrets—including the knowledge of how to identify and interpret FAA's data and use of its SQL Code and Alteryx workflows to extract, process and transform the FAA's data into a digestible format—to perform the same or substantially similar data processing, analysis, and reporting functions for the FAA.

167.    On or about May 5, 2026, the FAA advised SIG that it was not going to exercise the upcoming Option Period from May 1, 2026 to April 30, 2027, and instead would extend the ACQ Data Contract base year period of performance for an additional three months.

168.    This is contrary to the FAA's prior statements to SIG that the FAA planned on exercising Option Period 1 and increasing the ceiling and funding for SIG on the ACQ Data Contract.

169.    The FAA previously told SIG that all internal approvals were in place for funding and exercising Option Period 1.

170.    Avanz received four modifications to the Avanz Contract between March and May 2026 with increased funding. These modifications provided funding for the former SIG employees now working for Scope under its Subcontract with Avanz.

171.    The timing of these funding increases—coinciding with the Defendant Employees' departures from SIG and commencement of employment with Scope—demonstrates the coordinated nature of the Defendants' scheme to divert SIG's contract work and employees to the Avanz Contract.

172. On May 20, 2026, two months after SIG on-boarded the incoming ACQ Data Contract team, SIG determined that there are an additional nineteen (19) workflows being run on the FAA's Server that it was not aware of.

173. These nineteen (19) workflows employ data processing methodologies consistent with SIG Trade Secrets, indicating continued unauthorized use of SIG's proprietary techniques.

174. Despite SIG's cease and desist letters to the Defendants, their interference with SIG's ACQ Data Contract has continued.

175. On June 1, 2026, Avanz provided SIG with a customer guide, purportedly to assist with SIG's work under its contract. After reviewing the guide, SIG requested a meeting with Avanz to discuss some concerns it had regarding the information contained in the guide.

176. On June 6, 2026, SIG's Senior Vice President and two SIG employees met with Said to discuss a guide Avanz had provided to SIG. During the meeting, Said admitted to SIG that the guide, as well as a table contained therein purportedly for SIG's use was incorrect. Said then directed SIG to use a different table than the one identified in the guide created by Avanz.

177. On June 15, 2026, SIG learned that Scope had entered into a Master Government Subcontract Agreement with Ernst & Young LLP ("EY") on April 29, 2026 for Prime Contract No. 693KA9-19-D-00004. Scope's Chief Administrative Officer, Michelle Faletti, confirmed Scope's acceptance of a modification to this subcontract agreement "without changes." Upon information and belief, Mr. Said is performing or will perform work under this subcontract.

178. Scope's entry into this government subcontract—and Mr. Said's performance of work thereunder—constitutes additional Prohibited Activity in violation of Mr. Said's restrictive covenants under the MIPA and EEA, which prohibit him from contributing his knowledge to an

entity engaged in the business of government contracting three years following execution of the MIPA and twenty-four months from his departure from SIG.

179. SIG is at risk of losing its ACQ Data Contract entirely due to the wrongful conduct of the Defendants.

180. SIG is at risk of receiving lower customer ratings which will negatively impact its long and short term ability to win future prime contracts due to the wrongful conduct of the Defendants.

181. The loss of the ACQ Data Contract poses a significant threat to SIG's ability to continue operating as a going concern without the injection of substantial additional capital.

**COUNT I**
**MISAPPROPRIATION OF TRADE SECRETS UNDER**
**THE DEFEND TRADE SECRETS ACT, 18 U.S.C. § 1836, *et seq.***
(All Defendants)

182. SIG incorporates by reference its allegations set forth in the foregoing paragraphs as if fully set forth herein.

183. The SIG Trade Secrets—including (i) SIG's knowledge of how to identify, interpret, and use its customer's data to maximize utility; (ii) its unique SQL code used to create proprietary workflows that automate the extraction, processing, and transformation of its customers' data; (iii) its proprietary data visualizations used to display, validate, and report on customer data; and (iv) the specialized know-how required to create, operate, and maintain these workflows and visualizations—constitute "trade secrets" within the meaning of the Defend Trade Secrets Act, 18 U.S.C. § 1839(3).

184. The SIG Trade Secrets derive independent economic value, both actual and potential, from not being generally known to, and not being readily ascertainable through proper

means by, competitors and other persons who could obtain economic value from their disclosure or use.

185.    SIG's competitors—including Scope and Avanz—could not perform the FAA work contemplated by the Avanz Contract without access to SIG's proprietary methodology.

186.    SIG took reasonable measures to maintain the secrecy of the SIG Trade Secrets, including: (a) requiring all employees with access to its proprietary systems to execute Employment Agreements obligating them to maintain the strict confidentiality of SIG's proprietary information, trade secrets, source and object codes, data programs, works of authorship, and know-how during and after their employment; (b) storing the SIG Trade Secrets on a secure SharePoint site and utilizing them in secure FAA applications accessible only to authorized SIG employees working on Task Order 29 and the ACQ Data Contract; and (c) including non-disclosure, non-competition, and non-solicitation provisions in each individual Defendant's Employment Agreement restricting the use and disclosure of SIG's confidential and proprietary information.

187.    Said was further bound by the confidentiality and restrictive covenant provisions of the MIPA and EEA, which broadly defined "Prohibited Activity" to include "activity that may require or inevitably requires disclosure of trade secrets, proprietary information, or Confidential Information."

188.    Said acquired knowledge of the SIG Trade Secrets through his membership interest in SIG's predecessor-in-interest, eSolytics, and during his employment as Vice President of SIG, where he had direct access to SIG's proprietary SQL code, Alteryx workflows, and Tableau dashboards and datasets. Said acquired this knowledge under circumstances giving rise to a duty to maintain its secrecy and limit its use to SIG's benefit.

189. Said misappropriated the SIG Trade Secrets by disclosing them to Scope and Avanz to enable those entities to perform FAA work that they otherwise lacked the capability and experience to perform. Without the SIG Trade Secrets, Avanz—which had never been awarded a prime contract with the FAA—and Scope—which did not possess the 8(a) certification required for direct awards—could not have competed for or performed the Avanz Contract.

190. Barton, Burrows, Davis, and Trosper acquired knowledge of the SIG Trade Secrets through their work on Task Order 29 and the ACQ Data Contract, where they directly created, used, and maintained SIG's proprietary Alteryx workflows and Tableau dashboards. Each Defendant Employee acquired this knowledge under circumstances giving rise to a duty to maintain its secrecy and limit its use to SIG's benefit.

191. Upon their departure from SIG, the Defendant Employees misappropriated the SIG Trade Secrets by using them to perform the same or substantially similar work for Scope and Avanz on the Avanz Contract. The Defendant Employees knew or had reason to know that the SIG Trade Secrets were acquired under circumstances giving rise to a duty to maintain their secrecy.

192. Each individual Defendant's disclosure or use of the SIG Trade Secrets was without SIG's express or implied consent and in breach of the duty of confidentiality owed to SIG.

193. Scope and Avanz acquired and used the SIG Trade Secrets with knowledge or reason to know that the trade secrets were acquired through improper means—specifically, through Said's breach of his confidentiality obligations under the MIPA and EEA and the Defendant Employees' breaches of their Employment Agreements.

194. Scope and Avanz lacked the capability or experience to perform the FAA work contemplated by the Avanz Contract without obtaining SIG's Trade Secrets. Avanz's use of the SIG Trade Secrets is evidenced by its subcontract to Scope to obtain access to the Trade Secrets

32

through the Defendant Employees and Said. Defendants' continued unauthorized use of the SIG Trade Secrets is further evidenced by SIG's discovery on May 20, 2026 of nineteen (19) additional workflows running on the FAA's server that replicate SIG's proprietary data processing methodology.

195.    The SIG Trade Secrets were used in, and the misappropriation of the SIG Trade Secrets was related to, a product or service used in interstate commerce—namely, the performance of federal government contracts for the FAA involving data processing, analytics, and reporting services.

196.    The foregoing conduct constitutes misappropriation of trade secrets within the meaning of 18 U.S.C. § 1839(5) because: (a) Said and the Defendant Employees disclosed or used trade secrets without SIG's consent despite knowing or having reason to know that they acquired the trade secrets under circumstances giving rise to a duty to maintain secrecy; and (b) Scope and Avanz acquired, disclosed, and used trade secrets knowing or having reason to know that they were acquired through improper means.

197.    Defendants' misappropriation was willful and malicious. Defendants continued their misappropriation even after receiving cease-and-desist letters from SIG's counsel in April 2026, and Davis deleted SIG's Tableau dashboards on May 4, 2026—the same day SIG sent cease-and-desist letters to Scope and Avanz—demonstrating conscious disregard for SIG's rights.

198.    As a direct and proximate result of Defendants' misappropriation, SIG has suffered and will continue to suffer immediate and irreparable injury, including: (a) loss of its exclusive access to the SIG Trade Secrets; (b) loss of its competitive position in the government contracting market; (c) loss of business and employee goodwill; (d) loss of sales, opportunities, and customer stability; and (e) loss of its investment in developing the SIG Trade Secrets.

199.    There is no adequate remedy at law to prevent the irreparable harm occasioned by Defendants' ongoing misappropriation. SIG is entitled to preliminary and permanent injunctive relief under 18 U.S.C. § 1836(b)(3)(A).

200.    As a direct and proximate result of Defendants' misappropriation, SIG has suffered and will continue to suffer monetary damages. Because Defendants' misappropriation was willful and malicious, SIG is entitled to exemplary damages in an amount not more than two times any compensatory damages awarded, pursuant to 18 U.S.C. § 1836(b)(3)(C).

**WHEREFORE,** as to Count I, SIG respectfully requests the following relief against all Defendants: (1) preliminary and permanent injunctive relief pursuant to 18 U.S.C. § 1836(b)(3)(A); (2) compensatory damages in an amount to be proven at trial, but at least $5,000,000.00; (3) exemplary damages in an amount not more than two times the amount of damages awarded under 18 U.S.C. § 1836(b)(3)(B); (4) its reasonable attorneys' fees; and (5) such other and further relief as this court deems just and appropriate.

## COUNT II
### MISAPPROPRIATION OF TRADE SECRETS UNDER
### THE VIRGINIA UNIFORM TRADE SECRETS ACT, Va. Code § 59.1-336, *et seq.*
(All Defendants)

201.    SIG incorporates by reference its allegations set forth in the foregoing paragraphs as if fully set forth herein.

202.    The SIG Trade Secrets—including (i) SIG's knowledge of how to identify, interpret, and use its customer's data to maximize utility; (ii) its unique SQL code used to create proprietary workflows that automate the extraction, processing, and transformation of its customers' data; (iii) its proprietary data visualizations used to display, validate, and report on customer data; and (iv) the specialized know-how required to create, operate, and maintain these

34

workflows and visualizations—constitute "trade secrets" within the meaning of the Virginia Uniform Trade Secrets Act, Va. Code § 59.1-336.

203. The SIG Trade Secrets derive independent economic value, both actual and potential, from not being generally known to, and not being readily ascertainable through proper means by, other persons who could obtain economic value from their disclosure or use.

204. SIG's competitors—including Scope and Avanz—could not perform the FAA work contemplated by the Avanz Contract without access to SIG's proprietary methodology.

205. SIG took reasonable efforts to maintain the secrecy of the SIG Trade Secrets, including: (a) requiring all employees with access to its proprietary systems to execute Employment Agreements obligating them to maintain the strict confidentiality of SIG's proprietary information, trade secrets, source and object codes, data programs, works of authorship, and know-how during and after their employment; (b) storing the SIG Trade Secrets on a secure SharePoint site accessible only to authorized SIG employees working on the ACQ Data Contract; and (c) including non-disclosure, non-competition, and non-solicitation provisions in each individual Defendant's Employment Agreement restricting the use and disclosure of SIG's confidential and proprietary information.

206. Said was further bound by the confidentiality and restrictive covenant provisions of the MIPA and EEA, which broadly defined "Prohibited Activity" to include "activity that may require or inevitably requires disclosure of trade secrets, proprietary information, or Confidential Information."

207. Said acquired knowledge of the SIG Trade Secrets through his membership interest in SIG's predecessor-in-interest, eSolytics, and during his employment as Vice President of SIG, where he had direct access to SIG's proprietary SQL code, Alteryx workflows, and Tableau

35

dashboards and datasets. Said acquired this knowledge under circumstances giving rise to a duty to maintain its secrecy and limit its use to SIG's benefit.

208. Said misappropriated the SIG Trade Secrets by disclosing them to Scope and Avanz to enable those entities to perform FAA work that they otherwise lacked the capability and experience to perform.

209. Without the SIG Trade Secrets, Avanz—which had never been awarded a prime contract with the FAA—and Scope—which did not possess the 8(a) certification required for direct awards—could not have competed for or performed the Avanz Contract.

210. Barton, Burrows, Davis, and Trosper acquired knowledge of the SIG Trade Secrets through their work on Task Order 29 and the ACQ Data Contract, where they directly created, used, and maintained SIG's proprietary Alteryx workflows and Tableau dashboards. Each Defendant Employee acquired this knowledge under circumstances giving rise to a duty to maintain its secrecy and limit its use to SIG's benefit.

211. Upon their departure from SIG, the Defendant Employees misappropriated the SIG Trade Secrets by using them to perform the same or substantially similar work for Scope and Avanz on the Avanz Contract. The Defendant Employees knew or had reason to know that the SIG Trade Secrets were acquired under circumstances giving rise to a duty to maintain their secrecy.

212. Each individual Defendant's disclosure or use of the SIG Trade Secrets was without SIG's express or implied consent and in breach of the duty of confidentiality owed to SIG.

213. Scope and Avanz acquired and used the SIG Trade Secrets with knowledge or reason to know that the trade secrets were acquired through improper means—specifically, through Said's breach of his confidentiality obligations under the MIPA and EEA and the Defendant Employees' breaches of their Employment Agreements.

214. Scope and Avanz lacked the capability or experience to perform the FAA work contemplated by the Avanz Contract without obtaining SIG's Trade Secrets. Avanz's use of the SIG Trade Secrets is evidenced by its subcontract to Scope to obtain access to the Trade Secrets through the Defendant Employees and Said. Defendants' continued unauthorized use of the SIG Trade Secrets is further evidenced by SIG's discovery on May 20, 2026 of nineteen (19) additional workflows running on the FAA's server that replicate SIG's proprietary data processing methodology.

215. The foregoing conduct constitutes misappropriation of trade secrets within the meaning of Va. Code § 59.1-336 because: (a) Said and the Defendant Employees disclosed or used trade secrets without SIG's consent despite knowing or having reason to know that they acquired the trade secrets under circumstances giving rise to a duty to maintain secrecy; and (b) Scope and Avanz acquired, disclosed, and used trade secrets knowing or having reason to know that they were acquired through improper means.

216. Defendants' misappropriation was willful and malicious. Defendants continued their misappropriation even after receiving cease-and-desist letters from SIG's counsel in April 2026, and Davis deleted SIG's Tableau dashboards on May 4, 2026—the same day SIG sent cease-and-desist letters to Scope and Avanz—demonstrating conscious disregard for SIG's rights.

217. As a direct and proximate result of Defendants' misappropriation, SIG has suffered and will continue to suffer immediate and irreparable injury, including: (a) loss of its exclusive access to its Trade Secrets; (b) loss of its competitive position in the government contracting market; (c) loss of business and employee goodwill; (d) loss of sales, opportunities, and customer stability; and (e) loss of its investment in developing its Trade Secrets.

218.    There is no adequate remedy at law to prevent the irreparable harm occasioned by Defendants' ongoing misappropriation. SIG is entitled to injunctive relief under Va. Code § 59.1-337.

219.    As a direct and proximate result of Defendants' misappropriation, SIG has incurred and will in the future incur damages.

220.    Pursuant to Va. Code § 59.1-338(B), because Defendants' misappropriation was willful and malicious, SIG is entitled to exemplary damages in an amount not exceeding twice any award of actual damages.

221.    Pursuant to Va. Code § 59.1-338.1, because Defendants' misappropriation was willful and malicious, SIG is entitled to recover its reasonable attorneys' fees incurred in prosecuting this action.

**WHEREFORE,** as to Count II, SIG respectfully requests the following relief against all Defendants: (1) preliminary and permanent injunctive relief pursuant to Va. Code § 59.1-337; (2) compensatory damages in an amount to be proven at trial, but at least $5,000,000.00; (3) exemplary damages in an amount not exceeding twice any award of actual damages pursuant to Va. Code § 59.1-338(B); (4) pre-and post-judgment interest as permitted by Virginia law; (5) its reasonable attorneys' fees pursuant to Va. Code § 59.1-338.1; and (6) such other and further relief as this court deems just and appropriate.

**COUNT III**
**VIOLATION OF THE COMPUTER**
**FRAUD AND ABUSE ACT,**
**18 U.S.C. § 1030 *et seq*.**
(All Defendants)

222.    SIG incorporates by reference its allegations set forth in the foregoing paragraphs as if fully set forth herein.

38

223.    The FAA-provided computers and platforms on which SIG's Trade Secrets, Alteryx workflows, and Tableau dashboards reside constitute "protected computers" within the meaning of 18 U.S.C. § 1030(e)(2)(B), in that they were used in and affected interstate commerce and communication by facilitating the performance of federal government contracts involving data processing, analytics, and reporting for the FAA.

224.    SIG terminated Said's and the Defendant Employees' authorization to access SIG's Trade Secrets, Alteryx workflows, and Tableau dashboards upon their respective separations from SIG.

225.    Although the FAA subsequently appointed Said as Program Manager for both the Avanz Contract and the ACQ Data Contract, that appointment did not confer authorization to access SIG's proprietary data, workflows, or dashboards, which remained SIG's property and were accessible only with SIG's consent.

226.    No Defendant had authorization from SIG to access these systems after his or her separation, regardless of whether stored credentials had been formally revoked. Each Defendant knew that his or her authorization had been terminated.

227.    Despite lacking authorization, the Defendant Employees intentionally accessed SIG's Alteryx workflows and Tableau dashboards after their respective separations, using the FAA-issued laptops they retained upon departure.

228.    Upon information and belief, the Defendant Employees ran SIG's proprietary workflows for at least two weeks after their employment ended to extract data outputs for use on the Avanz Contract.

229. Said likewise intentionally accessed the same systems without authorization, using his FAA-granted credentials in his capacity as Program Manager to obtain data that belonged exclusively to SIG.

230. Through this unauthorized access, Said and the Defendant Employees obtained SIG's proprietary data outputs from protected computers, including the processed data, transformation logic, and reporting outputs generated by SIG's workflows—all of which constitute trade secrets critical to performance of the Avanz Contract.

231. That Defendants obtained and used information from SIG's protected computers is confirmed by SIG's discovery on May 20, 2026 of nineteen (19) additional workflows running on the FAA's server that had not been disclosed to SIG.

232. These workflows replicate SIG's proprietary methodology—including its distinctive approach to data extraction sequencing, transformation logic, and output formatting—and could not have been independently created without obtaining information from SIG's systems, because the underlying data structures and processing sequences are unique to SIG's work product.

233. The foregoing conduct—intentionally accessing a protected computer without authorization and obtaining information therefrom—violated 18 U.S.C. § 1030(a)(2)(C) and caused loss to SIG.

234. On April 14, 2026—one day after SIG sent its cease-and-desist letter to Said—SIG's Alteryx workflows were manually disabled on the FAA's protected computers.

235. SIG's investigation confirmed that the disablement resulted not from credential expiration but from the knowing transmission of commands or codes by one or more individuals with stored user credentials.

236. The workflows were reflected in Alteryx as "owned" by the Defendant Employees, and only individuals with such stored credentials—specifically, Said and the Defendant Employees using their retained FAA-issued laptops—had the technical ability to disable them. Said falsely attributed the disruption to expired credentials to conceal the sabotage.

237. This conduct, undertaken without SIG's authorization and for the benefit of Scope and Avanz, knowingly caused damage to a protected computer in violation of 18 U.S.C. § 1030(a)(5)(A).

238. On May 4, 2026—the same day SIG sent cease-and-desist letters to Scope and Avanz—Davis, acting without SIG's authorization, knowingly transmitted commands or codes that deleted multiple SIG Tableau dashboards from the FAA's protected computers. These dashboards were critical for daily data validation under the ACQ Data Contract and could not be recovered. This conduct knowingly caused damage to a protected computer in violation of 18 U.S.C. § 1030(a)(5)(A).

239. In the alternative, Said and the Defendant Employees are liable under 18 U.S.C. §§ 1030(a)(5)(B) and (C) because their intentional, unauthorized post-employment access to SIG's protected computers enabled the disabling and deletion described above, recklessly causing damage and loss to SIG.

240. The disabling of SIG's workflows and deletion of its dashboards impaired the integrity and availability of SIG's data and systems, constituting "damage" under 18 U.S.C. § 1030(e)(8). SIG incurred costs of responding to the offense and restoring affected systems, constituting "loss" under 18 U.S.C. § 1030(e)(11).

241. At the time of the foregoing acts, the Defendant Employees were employed by Scope on the Avanz Contract. Upon information and belief, Scope and Avanz directed, authorized,

41

or ratified the Defendant Employees' unauthorized access to and destruction of SIG's data. The Defendant Employees' conduct was undertaken for the express purpose of benefiting Scope and Avanz—including by sabotaging SIG's performance on the ACQ Data Contract and facilitating Avanz's competing performance—and Scope and Avanz knowingly accepted the benefits of that conduct.

242. As a direct and proximate result of the foregoing violations of 18 U.S.C. §§ 1030(a)(2) and (5), SIG has suffered damage and loss and will continue to suffer damage and loss in the future.

243. SIG's loss—including the costs of investigating the unauthorized access and sabotage, assessing the undisclosed workflows, restoring disabled workflows, rebuilding deleted dashboards, and hiring replacement personnel to recreate destroyed work product—well exceeds $5,000 in value during a one-year period.

244. Upon information and belief, Said and the Defendant Employees continue to access and use SIG's proprietary data and workflows without authorization to perform work on the Avanz Contract.

245. There is no adequate remedy at law to prevent the irreparable harm occasioned by Defendants' ongoing and threatened future violations of the CFAA, thereby necessitating the entry of preliminary and permanent injunctive relief pursuant to 18 U.S.C. § 1030(g).

**WHEREFORE,** as to Count III, SIG respectfully requests the following relief against all Defendants: (1) preliminary and permanent injunctive relief pursuant to 18 U.S.C. § 1030(g); (2) compensatory damages in an amount to be proven at trial, but at least $5,000,000.00; (3) pre-and post-judgment interest as permitted by law; and (4) such other and further relief as this court deems just and appropriate.

## COUNT IV
## VIOLATION OF THE VIRGINIA
## COMPUTER CRIMES ACT,
## Va. Code § 18.2-152.1 et seq.
(All Defendants)

246. SIG incorporates by reference its allegations set forth in the foregoing paragraphs as if fully set forth herein.

247. The FAA-provided computers and platforms on which SIG's Trade Secrets, Alteryx workflows, and Tableau dashboards reside constitute "computers" and "computer networks" within the meaning of Va. Code § 18.2-152.2.

248. SIG's Alteryx workflows, Tableau dashboards, SQL code, and data visualizations constitute "computer data," "computer programs," and "computer software" within the meaning of Va. Code § 18.2-152.2.

249. As set forth above, SIG terminated Said's and the Defendant Employees' authorization to access SIG's Trade Secrets, Alteryx workflows, and Tableau dashboards upon their respective separations from SIG. No Defendant had "authority" within the meaning of Va. Code § 18.2-152.4 to use any computer or computer network containing SIG's data after his or her separation.

250. Although the FAA subsequently appointed Said as Program Manager for both the Avanz Contract and the ACQ Data Contract, that appointment did not confer authority to access SIG's proprietary data, workflows, or dashboards. SIG's data remained SIG's property, accessible only with SIG's consent, regardless of Said's FAA role.

251. On April 14, 2026—one day after SIG sent its cease-and-desist letter to Said—one or more of Said and the Defendant Employees, without authority and with malicious intent, used

43

a computer or computer network to knowingly transmit commands or codes that removed, halted, and disabled SIG's Alteryx workflows, in violation of Va. Code §§ 18.2-152.4(A)(1) and (3).

252. The workflows were reflected in Alteryx as "owned" by the Defendant Employees. Only individuals with stored user credentials—specifically, Said and the Defendant Employees using their retained FAA-issued laptops—had the technical ability to disable them. SIG's investigation confirmed that the disablement was manual, not automatic. Said subsequently made a false statement attributing the disruption to expired credentials to conceal the sabotage.

253. On May 4, 2026—the same day SIG sent cease-and-desist letters to Scope and Avanz—Davis, without authority and with malicious intent, used a computer or computer network to knowingly transmit commands or codes that altered, disabled, and erased SIG's Tableau dashboards, in violation of Va. Code § 18.2-152.4(A)(3).

254. These dashboards were critical for daily data validation under the ACQ Data Contract and could not be recovered by SIG after Davis's deletion. Davis and Burrows had to go back and restore the dashboards after SIG identified this issue in its cease-and-desist letters to Scope and Avanz.

255. In addition, upon information and belief, Said and the Defendant Employees, without authority, have used computers and computer networks to access and make unauthorized copies of SIG's Trade Secrets, Alteryx workflows, and Tableau dashboards in order to perform work on the Avanz Contract for the benefit of Scope and Avanz, in violation of Va. Code § 18.2-152.4(A)(5).

256. SIG's discovery on May 20, 2026, of nineteen (19) additional workflows running on the FAA's server that had not been disclosed to SIG confirms that Defendants obtained and copied SIG's proprietary data and methodology without authority. These workflows replicate

SIG's distinctive approach to data extraction sequencing, transformation logic, and output formatting, and could not have been independently created without obtaining information from SIG's systems.

257. The foregoing conduct was undertaken for the benefit of Scope and Avanz. At the time of the foregoing acts, the Defendant Employees were employed by Scope on the Avanz Contract. Upon information and belief, Scope and Avanz directed, authorized, or ratified the Defendant Employees' unauthorized access to and destruction of SIG's data, and knowingly accepted the benefits of that conduct.

258. As a direct and proximate result of the foregoing violations of the Virginia Computer Crimes Act, SIG has suffered damages.

259. Upon information and belief, Said and the Defendant Employees continue to use computers and computer networks without authority to access SIG's proprietary data and workflows to perform work on the Avanz Contract.

260. There is no adequate remedy at law to prevent the irreparable harm occasioned by Defendants' ongoing and threatened future violations of the Virginia Computer Crimes Act, thereby necessitating the entry of preliminary and permanent injunctive relief in accordance with Va. Code § 18.2-152.12(D).

**WHEREFORE,** as to Count IV, SIG respectfully requests the following relief against all Defendants: (1) preliminary and permanent injunctive relief; (2) compensatory damages in an amount to be proven at trial, but at least $5,000,000.00; (3) punitive damages in the amount of $350,000.00; (4) pre-and post-judgment interest as permitted by Virginia law; and (5) such other and further relief as this court deems just and appropriate.

## COUNT V
## TORTIOUS INTERFERENCE WITH CONTRACT
(All Defendants)

261.    SIG incorporates by reference its allegations set forth in the foregoing paragraphs as if fully set forth herein.

262.    A valid contractual relationship exists between SIG and the FAA. On May 7, 2025, SIG was awarded Prime Contract Number 6973GH-25-D-00043, known as the ACQ Data Contract, an IDIQ contract with an expected ceiling of $4.5 million and a period of performance of sixty months from award—a Base Period from May 7, 2025 to May 6, 2026, and four Option Periods running until May 6, 2030.

263.    All Defendants had actual knowledge of the ACQ Data Contract. Said, as SIG's former Vice President and Project Manager on Task Order 29, had direct knowledge of the contract's existence, terms, and anticipated renewals. The Defendant Employees—Barton, Burrows, Davis, and Trosper—worked on the ACQ Data Contract from its inception and knew that it included four option years. Scope and Avanz had knowledge of the ACQ Data Contract because: (a) Said informed them of SIG's contract with the FAA; (b) Avanz received a competing direct award from the FAA one day after SIG was awarded the ACQ Data Contract; and (c) Scope employed the Defendant Employees specifically to perform the same work on the Avanz Contract.

264.    Scope and Avanz intentionally interfered with the ACQ Data Contract by: (a) recruiting and hiring the Defendant Employees—the only SIG employees capable of performing the specialized work required under the ACQ Data Contract—to deprive SIG of the personnel necessary to perform its contractual obligations; (b) directing or authorizing the Defendant Employees to disable SIG's Alteryx workflows on April 14, 2026, one day after SIG sent Said a cease-and-desist letter; (c) directing or authorizing Davis to delete SIG's Tableau dashboards on

May 4, 2026, the same day SIG sent cease-and-desist letters to Scope and Avanz; and (d) on June 1, 2026, providing SIG with a customer guide containing incorrect information and directing SIG to use incorrect data tables; (e) using Said, as Program Manager for both the Avanz Contract and the ACQ Data Contract, to obstruct SIG's ability to perform by stalling access to workflows, providing incorrect information, and misrepresenting the scope of SIG's work.

265.   Said intentionally interfered with the ACQ Data Contract by: (a) recruiting the Defendant Employees to leave SIG and join Scope, including by hosting them at an Oklahoma City Thunder basketball game in December 2025; (b) stalling for over two weeks before providing SIG with complete access to all one hundred ninety plus (190+) Alteryx workflows needed to perform the ACQ Data Contract; (c) initially providing access to only twenty-three (23) of the over one hundred ninety (190) workflows and falsely claiming SIG had access to everything; and (d) falsely informing SIG that certain tasks within its scope of work were not within its scope and were to be handled by his subject matter experts.

266.   The Defendant Employees intentionally interfered with the ACQ Data Contract by: (a) refusing to provide necessary transition support to SIG's incoming team during their notice periods; (b) failing to provide SIG with passwords, keys, and security codes necessary to access programs and applications as required by their Employment Agreements; (c) retaining their FAA-issued computers containing credentials needed to access SIG's workflows and dashboards; (d) on April 14, 2026, manually disabling SIG's Alteryx workflows, which were reflected in Alteryx as "owned" by the Defendant Employees; and (e) on May 4, 2026, through Davis, deleting SIG's Tableau dashboards that were critical for daily data validation under the ACQ Data Contract.

267.   Defendants' intentional interference induced a breach or termination of the ACQ Data Contract. On or about May 5, 2026, as a direct result of Defendants' conduct, the FAA advised

47

SIG that it would not exercise Option Period 1 (May 1, 2026 to April 30, 2027) and would instead extend the Base Period for only three additional months. This decision was contrary to the FAA's prior statements to SIG that all internal approvals were in place for exercising Option Period 1 and increasing the ceiling and funding for SIG.

268.   As a result of Defendants' interference, SIG is at risk of losing the ACQ Data Contract entirely. The FAA's decision not to exercise the option year coincided with four modifications to the competing Avanz Contract between March and May 2026 that increased Avanz's funding—funding that went to the former SIG employees now working for Scope under its subcontract with Avanz.

269.   Defendants used improper methods to interfere with the ACQ Data Contract. The improper methods included: (a) misappropriating SIG's Trade Secrets; (b) sabotaging SIG's operations by disabling workflows and deleting dashboards; (c) providing false information to SIG and the FAA; and (d) engaging in sharp dealing and unethical conduct designed to divert SIG's contract work to Avanz and Scope.

270.   Defendants' interference was willful and malicious. Defendants continued their interference even after receiving cease-and-desist letters from SIG's counsel: (a) Said received a cease-and-desist letter on April 13, 2026, and one day later SIG's workflows were disabled; (b) the Defendant Employees received cease-and-desist letters on April 15, 2026, and continued to refuse to provide transition support; (c) Scope and Avanz received cease-and-desist letters on May 4, 2026—the same day Davis deleted SIG's Tableau dashboards—and they denied wrongdoing and refused to comply with any of SIG's demands. This conduct evinces actual malice and a conscious disregard for SIG's rights, and Defendants are liable to SIG for punitive damages.

271.    There is no adequate remedy at law to prevent the irreparable harm occasioned by Defendants' ongoing tortious interference with the ACQ Data Contract. SIG's loss of the option year, its risk of losing the contract entirely, and the continuing presence of Defendants' competing operation using SIG's Trade Secrets cannot be adequately remedied by monetary damages alone. Preliminary and permanent injunctive relief is necessary to prevent further harm.

272.    As a direct and proximate result of Defendants' tortious interference, SIG has suffered and will continue to suffer damages, including: (a) loss of revenue from Option Period 1 of the ACQ Data Contract; (b) loss of anticipated revenue from the remaining option periods; (c) costs of responding to the sabotage of its workflows and dashboards; (d) costs of hiring and training replacement personnel; and (e) damage to SIG's reputation and customer relationships with the FAA.

**WHEREFORE,** as to Count V, SIG respectfully requests the following relief against all Defendants: (1) preliminary and permanent injunction; (2) compensatory damages in an amount to be proven at trial, but at least $5,000,000.00; (3) punitive damages in the amount of $350,000.00; (4) pre-and post-judgment interest as permitted by Virginia law; and (5) such other and further relief as this court deems just and appropriate.

**COUNT VI**
**VIRGINIA STATUTORY BUSINESS CONSPIRACY**
**Va. Code § 18.2-499 *et seq.***
(All Defendants)

273.    SIG incorporates by reference its allegations set forth in the foregoing paragraphs as if fully set forth herein.

274.    Virginia Code § 18.2-499 provides that any two or more persons who combine, associate, agree, mutually undertake, or concert together for the purpose of willfully and

maliciously injuring another in his reputation, trade, business, or profession shall be liable to such injured party in treble the damages sustained.

275. Two or more persons combined and concerted together to injure SIG. The conspirators are: (1) Scope Infotech, Inc.; (2) Avanz Systems, Inc.; (3) Sherif Said; (4) Shaun Barton; (5) Michelle Burrows; (6) Carla Davis; and (7) Mark Trosper, Jr.

276. Defendants agreed and mutually undertook a common plan for a common purpose. The existence of the agreement is evidenced by the following overt acts: (a) Said joined his brother's company, Scope, in September 2024, shortly after leaving SIG; (b) on May 8, 2025—one day after SIG was awarded the ACQ Data Contract—Avanz received a competing direct award from the FAA for identical work, and Scope immediately received a subcontract from Avanz; (c) Avanz's CEO publicly thanked "our friends at Scope Infotech" on LinkedIn when announcing the Avanz Contract; (d) Said attended an Oklahoma City Thunder basketball game with Barton, Davis, and Trosper in December 2025, after which all three resigned from SIG within three months; (e) Scope submitted employment verification requests for Barton in December 2025; (f) the Defendant Employees, while still employed by SIG, refused to provide transition support and obstructed SIG's knowledge transfer efforts; (g) after their departures, the Defendant Employees disabled SIG's Alteryx workflows and deleted SIG's Tableau dashboards; and (h) Scope confirmed on June 1, 2026 that all four Defendant Employees are now employed by Scope.

277. The purpose of the conspiracy was to injure SIG in its trade, business, and profession by: (a) recruiting and hiring the Defendant Employees to deprive SIG of the personnel necessary to perform its contractual obligations and to gain access to SIG's Trade Secrets; and (b) using SIG's Trade Secrets to perform work on the Avanz Contract, thereby diverting SIG's contract work, customers, and profits to the conspirators.

278.    Defendants acted with the specific intent to injure SIG in its trade, business, and profession. Defendants' conduct was designed to: (a) destroy SIG's ability to perform the ACQ Data Contract; (b) misappropriate SIG's Trade Secrets; and (c) divert the FAA's contract work from SIG to the Avanz Contract.

279.    Defendants acted willfully and maliciously. Defendants acted voluntarily and intentionally, not by accident or inadvertence. Defendants acted with knowledge that their conduct would injure SIG and in conscious disregard of SIG's rights. Defendants' willfulness and malice is demonstrated by: (a) their continuation of the conspiracy after receiving cease-and-desist letters from SIG's counsel in April and May 2026; (b) the disabling of SIG's Alteryx workflows on April 14, 2026, one day after Said received his cease-and-desist letter; (c) Scope and Avanz received cease-and-desist letters on May 4, 2026—the same day Davis deleted SIG's Tableau dashboards—and they denied wrongdoing and refused to comply with any of SIG's demands and (d) Defendants' ongoing refusal to provide transition assistance.

280.    The conspiracy was coordinated out of Avanz's offices in Leesburg, Virginia.

281.    The conspiracy succeeded in injuring SIG in its trade, business, and profession. As a result of the conspiracy: (a) SIG lost its four most experienced employees on the ACQ Data Contract; (b) SIG's Alteryx workflows were disabled; (c) SIG's Tableau dashboards were deleted; (d) the FAA declined to exercise Option Period 1 of the ACQ Data Contract; and (e) SIG is at risk of losing the ACQ Data Contract entirely.

282.    As a direct and proximate result of the conspiracy, SIG has suffered and will continue to suffer damages, including: (a) loss of revenue from Option Period 1 of the ACQ Data Contract; (b) loss of anticipated revenue from the remaining option periods through May 2030; (c) costs incurred in responding to the sabotage of its workflows and dashboards; (d) costs of hiring

51

and training replacement personnel; (e) damage to SIG's reputation and customer relationships with the FAA; and (f) loss of competitive position in the government contracting market.

283.    Each Defendant is jointly and severally liable for the damages caused by the conspiracy. Each Defendant participated in the conspiracy with knowledge of its objectives and took overt acts in furtherance of the conspiracy. Scope and Avanz are liable for the acts of their employees and agents performed within the scope of the conspiracy.

284.    Pursuant to Va. Code § 18.2-500(A), SIG is entitled to recover treble the damages sustained, plus costs of suit and reasonable attorneys' fees.

285.    There is no adequate remedy at law to prevent the ongoing and irreparable harm caused by Defendants' continuing conspiracy, and SIG is entitled to preliminary and permanent injunctive relief pursuant to Va. Code § 18.2-500(A).

286.    Defendants' conduct was willful, malicious, and intentional, and was undertaken with actual malice and conscious disregard for SIG's rights. Accordingly, SIG is entitled to punitive damages.

**WHEREFORE**, as to Count VI, SIG respectfully requests the following relief against all Defendants: (1) preliminary and permanent injunctive relief pursuant to Va. Code § 18.2-500; (2) compensatory damages in an amount to be proven at trial, but at least $5,000,000.00; (3) treble damages pursuant to Va. Code § 18.2-500; (4) reasonable attorneys' fees and costs pursuant to Va. Code § 18.2-500; (5) pre-and post-judgment interest as permitted by Virginia law; and (6) such other and further relief as this court deems just and appropriate.

## COUNT VII
### BREACH OF FIDUCIARY DUTY
(Defendant Said)

287.    SIG incorporates by reference its allegations set forth in the foregoing paragraphs as if fully set forth herein.

288.    As a member and CEO of SIG's predecessor-in-interest, eSolytics, and later as a Vice President of SIG, Said occupied a position of trust and confidence and was responsible for, among other things, managing SIG's FAA contracts and customer relationships, overseeing SIG's proprietary data analytics operations, and at all times serving, protecting and advancing SIG's best interests. Said's role required him to exercise discretion and independent judgment in matters affecting SIG's business operations and customer relationships.

289.    As SIG's Vice President, Said was placed in a special relationship of trust and confidence with SIG, to which he owed a fiduciary duty.

290.    Said breached his fiduciary duty of loyalty to SIG in several ways, including but not limited to: (a) while still employed by SIG, laying the groundwork to compete with SIG by cultivating relationships with Scope, his brother's company; (b) sharing SIG's customer information and Trade Secrets with Scope and Avanz; (c) misappropriating SIG's Trade Secrets for use by SIG's direct competitors; (d) soliciting SIG's customers and the Defendant Employees to benefit Scope and Avanz; (e) actively competing with SIG after his departure in violation of his contractual and fiduciary obligations; (f) diverting business opportunities away from SIG and to Avanz and Scope; (g) sabotaging SIG's relationship with the FAA by falsely representing that SIG could not provide AI services; and (h) acting in a manner materially adverse to SIG's interests while purportedly serving as Program Manager for SIG's ACQ Data Contract.

291.    As a result of Said's conduct described above, he has acted with ill will, a desire to injure SIG, actual malice and in willful disregard for the rights of SIG.

292.    SIG has discovered Said's breaches within the past year. Moreover, many of the breaches are continuing.

293.    Said's breaches of his fiduciary duties to SIG have injured SIG.

**WHEREFORE,** as to Count VII, SIG respectfully requests the following relief against Defendant Said: (1) compensatory damages in an amount to be proven at trial, but at least $5,000,000.00; (2) punitive damages in the amount of $350,000.00; (3) pre-and post-judgment interest as permitted by Virginia law; and (4) such other and further relief as this court deems just and appropriate.

**COUNT VIII**
**TORTIOUS INTERFERENCE WITH BUSINESS RELATIONS**
(Defendant Said)

294.    SIG incorporates by reference its allegations set forth in the foregoing paragraphs as if fully set forth herein.

295.    SIG had a valid business relationship and reasonable expectancy of continued business with the FAA. SIG had performed data analytics services for the FAA under Task Order 29 since acquiring eSolytics in May 2023. The FAA exercised all available option periods on Task Order 29. In May 2025, the FAA awarded SIG the ACQ Data Contract (Contract No. 6973GH-25-D-00043), a new five-year contract with a ceiling value of $4.5 million. The FAA informed SIG that all internal approvals were in place for exercising Option Period 1 of the ACQ Data Contract and increasing SIG's funding. The FAA provided positive feedback on SIG's performance.

296.    SIG had a reasonable expectation of continued and expanded work with the FAA, including: (a) exercise of the four remaining option periods under the ACQ Data Contract through

May 2030; (b) increased funding levels; and (c) additional task orders and contract opportunities based on SIG's established customer relationship and performance history.

297. Said had actual knowledge of SIG's business relationship and reasonable expectancy with the FAA. Said served as a member and CEO of eSolytics before SIG acquired eSolytics. Said served as SIG's Vice President and as the Project Manager on Task Order 29.

298. In those roles, Said had direct knowledge of: (a) SIG's customer relationships with the FAA; (b) SIG's contract performance and the FAA's satisfaction with SIG's work; (c) the FAA's plans to exercise option periods and increase funding; (d) SIG's business opportunities with the FAA; and (e) the value of SIG's ongoing relationship with the FAA to SIG's business.

299. Said intentionally interfered with SIG's business relationship and expectancy with the FAA.

300. Said's acts of intentional interference included: (a) misrepresenting his relationship with SIG to the FAA by allowing the FAA to believe he still represented SIG after he had departed to join Scope; (b) falsely stating to the FAA that SIG was not capable of providing AI services, which caused the AI Services Contract to be awarded to another company instead of SIG; (c) convincing the FAA to reduce SIG's funding on Task Order 29 by approximately $250,000 and transfer that funding to Scope so that Said could continue to act as the Program Manager; (d) positioning Scope and Avanz to receive a direct award from the FAA for work identical to SIG's ACQ Data Contract; (e) recruiting SIG's employees to leave SIG and join Scope to perform work on the competing Avanz Contract; and (f) obstructing SIG's performance under the ACQ Data Contract by stalling knowledge transfer, providing incorrect information, and misrepresenting the scope of SIG's work.

301. Said used improper methods to interfere with SIG's business relationship and expectancy with the FAA.

302. Said's improper methods included: (a) fraud and misrepresentation to the FAA regarding his relationship with SIG and SIG's capabilities; (b) misappropriation of SIG's Trade Secrets for use by Scope and Avanz; (c) breaches of his contractual confidentiality, non-competition, and non-solicitation obligations under the MIPA and EEA; (d) breaches of his fiduciary duties to SIG; (e) deliberate sabotage of SIG's contract performance by providing incorrect information and obstructing knowledge transfer; and (f) tortious interference with SIG's employee relationships by recruiting the Defendant Employees to leave SIG.

303. Said acted with the specific intent to injure SIG and to benefit himself, Scope, and Avanz. Said's interference was not undertaken for any legitimate competitive purpose but was designed to divert SIG's FAA business to Scope and Avanz while Said was still bound by contractual and fiduciary obligations to SIG.

304. Said's interference was willful and malicious. Said acted with ill will, a desire to injure SIG, and in conscious disregard of SIG's rights. Said continued his interference even after receiving a cease-and-desist letter from SIG's counsel on April 13, 2026.

305. As a direct and proximate result of Said's tortious interference, SIG has suffered and will continue to suffer damages, including: (a) loss of the AI Services Contract, which was awarded to another company based on Said's false statements; (b) loss of approximately $250,000 in funding on Task Order 29, which was transferred to Scope; (c) damage to SIG's reputation and customer relationship with the FAA; and (d) loss of future business opportunities with the FAA.

306. Said's tortious interference is ongoing and continues to cause harm to SIG's business relationship and expectancy with the FAA.

**WHEREFORE,** as to Count VIII, SIG respectfully requests the following relief against Defendant Said: (1) compensatory damages in an amount to be proven at trial, but at least $5,000,000.00; (2) punitive damages in the amount of $350,000.00; (3) pre-and post-judgment interest as permitted by Virginia law; and (4) such other and further relief as this court deems just and appropriate.

**COUNT IX**
**BREACH OF CONTRACT-**
**MEMBERSHIP INTEREST PURCHASE AGREEMENT**
(Defendant Said)

307.    SIG incorporates by reference its allegations set forth in the foregoing paragraphs as if fully set forth herein.

308.    The MIPA is a valid and enforceable contract between SIG and Said, executed on May 31, 2023, in connection with SIG's acquisition of eSolytics.

309.    SIG fully performed its obligations under the MIPA, including paying Said the full purchase price for the Membership Interests in eSolytics.

310.    Under Section 5.01, Said agreed to "hold, in confidence any and all information, in any form, concerning [eSolytics and SIG]." Said breached Section 5.01 by disclosing SIG's confidential and proprietary information, including its Trade Secrets, to Scope and Avanz.

311.    Under Section 5.02(a), Said agreed that for three years from execution of the MIPA, he would not: (i) engage in or assist others in engaging in Prohibited Activity; (ii) have an interest in any Person that engages in Prohibited Activity; or (iii) interfere with SIG's business relationships with its customers or suppliers.

312.    Said breached Section 5.02(a) by: (a) joining Scope, his brother's company, in September 2024; (b) serving as the Program Manager on the Avanz Contract; and (c) performing

work under Scope's subcontract with Ernst & Young LLP for Prime Contract No. 693KA9-19-D-00004 on or about April 29, 2026.

313.   Under Section 5.02(b), Said agreed that for three years following execution of the MIPA, he would not directly or indirectly hire or solicit any current or former employee of SIG or eSolytics. Said breached Section 5.02(b) by directly or indirectly soliciting the Defendant Employees to leave SIG and join Scope.

314.   Under Section 5.02(a)(iii), Said agreed not to interfere with SIG's business relationships with its customers or suppliers.

315.   Said breached Section 5.02(a)(iii) by, *inter alia*: (a) stalling for two weeks before providing SIG with complete access to all Alteryx workflows; and (b) on March 23, 2026, soliciting a SIG customer to find additional work for Burrows and Davis on an FAA contract vehicle.

316.   As a direct and proximate result of Said's breaches of the MIPA, SIG has suffered and will continue to suffer damages, including: (a) loss of its Trade Secrets and confidential information; (b) loss of its four most experienced employees on the ACQ Data Contract; (c) damage to its customer relationships with the FAA; and (d) loss of competitive position in the government contracting market.

317.   Pursuant to Section 5.02(c) of the MIPA, Said acknowledged that a breach of the non-competition and non-solicitation provisions "would give rise to irreparable harm to [SIG], for which monetary damages would not be an adequate remedy," and agreed that SIG would "be entitled to equitable relief, including a temporary restraining order, an injunction, specific performance, and any other relief that may be available from a court of competent jurisdiction."

318.    SIG has suffered and will continue to suffer irreparable harm as a result of Said's breaches that cannot be adequately remedied by monetary damages alone.

319.    The MIPA governs the sale of eSolytics, including all of its trade secrets, know-how, customer relationships, and goodwill. These assets are unique and cannot be readily replaced. Said's ongoing violations continue to cause SIG to lose its Trade Secrets, customer relationships, employee relationships, and competitive position.

320.    SIG is entitled to: (a) preliminary and permanent injunctive relief enjoining Said from engaging in Prohibited Activity, disclosing SIG's confidential information, soliciting SIG's employees, and interfering with SIG's customer relationships; (b) specific performance of Said's obligations under Sections 5.01 and 5.02 of the MIPA; (c) indemnification for all Losses pursuant to Section 7.01(b) of the MIPA; and (d) in the alternative, compensatory damages.

**WHEREFORE,** as to Count IX, SIG respectfully requests the following relief against Defendant Said: (1) preliminary and permanent injunctive relief, enjoining Said from engaging in Prohibited Activity, disclosing SIG's confidential information and Trade Secrets, soliciting or hiring SIG's employees, and interfering with SIG's customer and supplier relationships; (2) specific performance of Said's obligations under the MIPA, including compliance with the confidentiality, non-competition, non-solicitation, and non-interference provisions; (3) indemnification for all Losses incurred as a result of Said's breaches of the MIPA pursuant to Section 7.01(b); (4) in the alternative, compensatory damages in an amount to be proven at trial, but at least $5,000,000.00; (5) pre-and post-judgment interest as permitted by Virginia law; and (6) such other and further relief as this court deems just and appropriate.

**COUNT X**
**BREACH OF CONTRACT –**
**EXECUTIVE EMPLOYMENT AGREEMENT**
(Defendant Said)

321.    SIG incorporates by reference its allegations set forth in the foregoing paragraphs as if fully set forth herein.

322.    The EEA is a valid and enforceable contract between SIG and Said, executed as part of Said's employment with SIG as Vice President.

323.    SIG fully performed its obligations under the EEA.

324.    Under Section 7.1, Said agreed to hold in strictest confidence SIG's Confidential Information, including its trade secrets, know-how, computer programs, and applications, and not to use or disclose such information except as necessary in the performance of his duties for SIG.

325.    Said breached Section 7.1 by disclosing SIG's Confidential Information, including its Trade Secrets and know-how, to Scope and Avanz.

326.    Under Section 8.2, Said agreed that for twenty-four months following the end of his employment with SIG, he would not contribute his knowledge to any entity engaged in government contracting that is defined as a Small Business, and would not engage in Prohibited Activity, which includes activity that may require or inevitably requires disclosure of trade secrets or Confidential Information.

327.    Said breached Section 8.2 by: (a) accepting employment with Scope within twenty-four months following the end of his employment with SIG; (b) serving as the Program Manager on the Avanz Contract; (c) performing work under Scope's subcontract with Ernst & Young LLP for Prime Contract No. 693KA9-19-D-00004; and (d) engaging in activity that required disclosure of SIG's Trade Secrets to Scope and Avanz.

328. Under Section 8.3, Said agreed that during his employment with SIG and for five years thereafter, he would not directly or indirectly solicit, hire, recruit, or induce the termination of employment of any employee of SIG.

329. Said breached Section 8.3 by directly or indirectly encouraging the Defendant Employees to resign from their positions at SIG and accept positions with Scope.

330. Under Section 8.4, Said agreed that for five years from the last day of his employment with SIG, he would not directly or indirectly solicit, contact, or meet with SIG's current, former, or prospective customers for purposes of offering goods or services competitive with those offered by SIG.

331. Said breached Section 8.4 by soliciting SIG's customers, including on March 23, 2026, when Said solicited a SIG customer in an attempt to find additional work for Burrows and Davis on an FAA contract vehicle.

332. Under Section 14.2, Said agreed to return all of SIG's property, including Trade Secrets, and to delete or destroy all copies of documents containing Confidential Information or Work Product.

333. Upon information and belief, Said breached Section 14.2 by failing to return all SIG property, including SIG's Trade Secrets, and failing to delete or destroy copies of SIG's Trade Secrets that remained in his possession.

334. As a direct and proximate result of Said's breaches of the EEA, SIG has suffered and will continue to suffer damages, including: (a) loss of its Trade Secrets and Confidential Information; (b) loss of its four most experienced employees on the ACQ Data Contract; (c) damage to its customer relationships with the FAA; and (d) loss of competitive position in the government contracting market.

61

335.    Pursuant to Section 8.4 of the EEA, Said acknowledged that "loss of this customer relationship and/or goodwill will cause significant and irreparable harm."

336.    SIG has suffered and will continue to suffer irreparable harm as a result of Said's breaches that cannot be adequately remedied by monetary damages alone. Said served as Vice President of SIG and had access to SIG's most sensitive Trade Secrets, customer relationships, and business strategies. Said's ongoing violations continue to cause SIG to lose its Trade Secrets, customer relationships, employee relationships, and competitive position.

337.    SIG is entitled to: (a) preliminary and permanent injunctive relief enjoining Said from engaging in Prohibited Activity, disclosing SIG's Confidential Information, soliciting SIG's employees, and soliciting SIG's customers; (b) specific performance of Said's obligations under Sections 7.1, 8.2, 8.3, 8.4, and 14.2 of the EEA; and (c) in the alternative, compensatory damages.

**WHEREFORE,** as to Count X, SIG respectfully requests the following relief against Defendant Said: (1) preliminary and permanent injunctive relief, enjoining Said from engaging in Prohibited Activity, disclosing SIG's Confidential Information and Trade Secrets, soliciting or hiring SIG's employees, and soliciting or contacting SIG's customers; (2) specific performance of Said's obligations under the EEA, including compliance with the confidentiality, non-competition, employee non-solicitation, and customer non-solicitation provisions; (3) in the alternative, compensatory damages in an amount to be proven at trial, but at least $1,000,000.00; (4) pre-and post-judgment interest as permitted by Virginia law; and (5) such other and further relief as this court deems just and appropriate.

## COUNT XI
## BREACH OF CONTRACT
(Defendant Barton)

338.    SIG incorporates by reference its allegations set forth in the foregoing paragraphs as if fully set forth herein.

339.    The Employment Agreement between SIG and Barton is a valid and enforceable contract.

340.    Barton breached the Employment Agreement's confidentiality provisions. Under Sections 1.1 and 1.2, Barton agreed to hold in strictest confidence SIG's confidential and proprietary information, including its trade secrets, processes, source and object codes, data programs, and know-how. This obligation continued after termination of his employment.

341.    Barton breached Sections 1.1 and 1.2 by disclosing and using SIG's Trade Secrets and Confidential Information for the benefit of himself, Scope, and Avanz.

342.    Barton breached the Employment Agreement's non-competition provisions. Under Section 4.4, Barton agreed not to perform or hold himself out as available to perform Conflicting Services for SIG's customers. Under Section 4.5, Barton agreed not to authorize or permit any competitor to represent that he is available to work on work SIG is currently performing or competing for.

343.    Barton breached Sections 4.4 and 4.5 by: (a) working for Scope on the Avanz Contract; and (b) permitting Scope and Avanz to hold him out as available to perform the same or substantially similar services for the FAA.

344.    Barton breached the Employment Agreement's departure obligations. Under Section 7, Barton agreed to return all SIG property and documents, not to alter, delete, or amend

any electronic media or data without written consent, and to provide SIG with all applicable passwords and security codes.

345.    Barton breached Section 7 by: (a) failing to provide SIG with a list of all applicable passwords, keys, and security codes; and (b) upon information and belief, disabling SIG's Alteryx workflows.

346.    SIG fully performed its obligations under the Employment Agreement.

347.    As a direct and proximate result of Barton's breaches, SIG has suffered and will continue to suffer damages, including: (a) loss of its Trade Secrets and Confidential Information; (b) costs of investigating unauthorized access and sabotage; (c) costs of restoring disabled workflows; and (d) attorneys' fees.

348.    Barton acknowledged in the Employment Agreement that "any threatened or actual violation of this Agreement or any of its terms will constitute immediate and irreparable injury to the Company." SIG has suffered and will continue to suffer irreparable harm as a result of Barton's breaches that cannot be adequately remedied by monetary damages alone.

349.    SIG is entitled to: (a) permanent injunctive relief enjoining Barton from disclosing SIG's Confidential Information and performing Conflicting Services; (b) specific performance of Barton's obligations under Sections 1.1, 1.2, 1.4, 4.4, 4.5, and 7; (c) attorneys' fees and costs pursuant to Section 10.2; and (d) in the alternative, compensatory damages.

**WHEREFORE,** as to Count XI, SIG respectfully requests the following relief against Defendant Barton: (1) permanent injunctive relief, enjoining Barton from disclosing SIG's Confidential Information and Trade Secrets; (2) specific performance of Barton's obligations under the Employment Agreement, including compliance with the confidentiality, non-competition, and departure obligations for a period of two years following entry of judgment; (3)

its reasonable attorneys' fees and costs pursuant to Section 10.2 of the Employment Agreement; (4) in the alternative, compensatory damages in an amount to be proven at trial, but at least $1,000,000.00; (5) pre-and post-judgment interest as permitted by Virginia law; and (6) such other and further relief as this court deems just and appropriate.

## COUNT XII
### BREACH OF CONTRACT – EMPLOYMENT AGREEMENT
(Defendant Burrows)

350.     SIG incorporates by reference its allegations set forth in the foregoing paragraphs as if fully set forth herein.

351.     The Employment Agreement between SIG and Burrows is a valid and enforceable contract.

352.     Burrows breached the Employment Agreement's confidentiality provisions. Under Sections 1.1 and 1.2, Burrows agreed to hold in strictest confidence SIG's confidential and proprietary information, including its trade secrets, processes, source and object codes, data programs, and know-how. This obligation continued after termination of her employment.

353.     Burrows breached Sections 1.1 and 1.2 by disclosing and using SIG's Trade Secrets and Confidential Information for the benefit of herself, Scope, and Avanz.

354.     Burrows breached the Employment Agreement's non-competition provisions. Under Section 4.4, Burrows agreed not to perform or hold herself out as available to perform Conflicting Services for SIG's customers. Under Section 4.5, Burrows agreed not to authorize or permit any competitor to represent that she is available to work on work SIG is currently performing or competing for.

355.    Burrows breached Sections 4.4 and 4.5 by: (a) working for Scope on the Avanz Contract; and (b) permitting Scope and Avanz to hold her out as available to perform the same or substantially similar services for the FAA.

356.    Burrows breached the Employment Agreement's departure obligations. Under Section 7, Burrows agreed to return all SIG property and documents, not to alter, delete, or amend any electronic media or data without written consent, and to provide SIG with all applicable passwords and security codes.

357.    Burrows breached Section 7 by: (a) failing to provide SIG with a list of all applicable passwords, keys, and security codes; and (b) upon information and belief, disabling SIG's Alteryx workflows.

358.    SIG fully performed its obligations under the Employment Agreement.

359.    As a direct and proximate result of Burrows' breaches, SIG has suffered and will continue to suffer damages, including: (a) loss of its Trade Secrets and Confidential Information; (b) costs of investigating unauthorized access and sabotage; (c) costs of restoring disabled workflows; and (d) attorneys' fees.

360.    Burrows acknowledged in the Employment Agreement that "any threatened or actual violation of this Agreement or any of its terms will constitute immediate and irreparable injury to the Company." SIG has suffered and will continue to suffer irreparable harm as a result of Burrows' breaches that cannot be adequately remedied by monetary damages alone.

361.    SIG is entitled to: (a) permanent injunctive relief enjoining Burrows from disclosing SIG's Confidential Information and performing Conflicting Services; (b) specific performance of Burrows' obligations under Sections 1.1, 1.2, 1.4, 4.4, 4.5, and 7; (c) attorneys' fees and costs pursuant to Section 10.2; and (d) in the alternative, compensatory damages.

**WHEREFORE,** as to Count XII, SIG respectfully requests the following relief against Defendant Burrows: (1) permanent injunctive relief, enjoining Burrows from disclosing SIG's Confidential Information and Trade Secrets; (2) specific performance of Burrows's obligations under the Employment Agreement, including compliance with the confidentiality, non-competition, and departure obligations; (3) its reasonable attorneys' fees and costs pursuant to Section 10.2 of the Employment Agreement; (4) in the alternative, compensatory damages in an amount to be proven at trial, but at least $1,000,000.00; (5) pre-and post-judgment interest as permitted by Virginia law; and (6) such other and further relief as this court deems just and appropriate.

<u>**COUNT XIII**</u>
**BREACH OF CONTRACT**
(Defendant Davis)

362. SIG incorporates by reference its allegations set forth in the foregoing paragraphs as if fully set forth herein.

363. The Employment Agreement between SIG and Davis is a valid and enforceable contract.

364. Davis breached the Employment Agreement's confidentiality provisions. Under Sections 1.1 and 1.2, Davis agreed to hold in strictest confidence SIG's confidential and proprietary information, including its trade secrets, processes, source and object codes, data programs, and know-how. This obligation continued after termination of her employment.

365. Davis breached Sections 1.1 and 1.2 by disclosing and using SIG's Trade Secrets and Confidential Information for the benefit of herself, Scope, and Avanz.

366. Davis breached the Employment Agreement's non-competition provisions. Under Section 4.4, Davis agreed not to perform or hold herself out as available to perform Conflicting

67

Services for SIG's customers. Under Section 4.5, Davis agreed not to authorize or permit any competitor to represent that she is available to work on work SIG is currently performing or competing for.

367.    Davis breached Sections 4.4 and 4.5 by: (a) working for Scope on the Avanz Contract; and (b) permitting Scope and Avanz to hold her out as available to perform the same or substantially similar services for the FAA.

368.    Davis breached the Employment Agreement's departure obligations. Under Section 7, Davis agreed to return all SIG property and documents, not to alter, delete, or amend any electronic media or data without written consent, and to provide SIG with all applicable passwords and security codes.

369.    Davis breached Section 7 by: (a) failing to provide SIG with a list of all applicable passwords, keys, and security codes; (b) altering, deleting, or amending SIG's electronic media, files, or data without written consent on May 4, 2026; and (c) upon information and belief, disabling SIG's Alteryx workflows.

370.    SIG fully performed its obligations under the Employment Agreement.

371.    As a direct and proximate result of Davis' breaches, SIG has suffered and will continue to suffer damages, including: (a) loss of its Trade Secrets and Confidential Information; (b) costs of investigating unauthorized access and sabotage; (c) costs of restoring disabled workflows and deleted data; and (d) attorneys' fees.

372.    Davis acknowledged in the Employment Agreement that "any threatened or actual violation of this Agreement or any of its terms will constitute immediate and irreparable injury to the Company." SIG has suffered and will continue to suffer irreparable harm as a result of Davis' breaches that cannot be adequately remedied by monetary damages alone.

373.    SIG is entitled to: (a) permanent injunctive relief enjoining Davis from disclosing SIG's Confidential Information and performing Conflicting Services; (b) specific performance of Davis' obligations under Sections 1.1, 1.2, 1.4, 4.4, 4.5, and 7; (c) attorneys' fees and costs pursuant to Section 10.2; and (d) in the alternative, compensatory damages.

**WHEREFORE,** as to Count XIII, SIG respectfully requests the following relief against Defendant Davis: (1) permanent injunctive relief, enjoining Davis from disclosing SIG's Confidential Information and Trade Secrets; (2) specific performance of Davis's obligations under the Employment Agreement, including compliance with the confidentiality, non-competition, and departure obligations; (3) its reasonable attorneys' fees and costs pursuant to Section 10.2 of the Employment Agreement; (4) in the alternative, compensatory damages in an amount to be proven at trial, but at least $1,000,000.00; (5) pre-and post-judgment interest as permitted by Virginia law; and (6) such other and further relief as this court deems just and appropriate.

**COUNT XIV**
**BREACH OF CONTRACT**
(Defendant Trosper)

374.    SIG incorporates by reference its allegations set forth in the foregoing paragraphs as if fully set forth herein.

375.    The Employment Agreement between SIG and Trosper is a valid and enforceable contract.

376.    Trosper breached the Employment Agreement's confidentiality provisions. Under Sections 1.1 and 1.2, Trosper agreed to hold in strictest confidence SIG's confidential and proprietary information, including its trade secrets, processes, source and object codes, data programs, and know-how. This obligation continued after termination of his employment.

377. Trosper breached Sections 1.1 and 1.2 by disclosing and using SIG's Trade Secrets and Confidential Information for the benefit of himself, Scope, and Avanz.

378. Trosper breached the Employment Agreement's non-competition provisions. Under Section 4.4, Trosper agreed not to perform or hold himself out as available to perform Conflicting Services for SIG's customers. Under Section 4.5, Trosper agreed not to authorize or permit any competitor to represent that he is available to work on work SIG is currently performing or competing for.

379. Trosper breached Sections 4.4 and 4.5 by: (a) working for Scope on the Avanz Contract; and (b) permitting Scope and Avanz to hold him out as available to perform the same or substantially similar services for the FAA.

380. Trosper breached the Employment Agreement's departure obligations. Under Section 7, Trosper agreed to return all SIG property and documents, not to alter, delete, or amend any electronic media or data without written consent, and to provide SIG with all applicable passwords and security codes.

381. Trosper breached Section 7 by: (a) failing to provide SIG with a list of all applicable passwords, keys, and security codes; and (b) upon information and belief, disabling SIG's Alteryx workflows.

382. SIG fully performed its obligations under the Employment Agreement.

383. As a direct and proximate result of Trosper's breaches, SIG has suffered and will continue to suffer damages, including: (a) loss of its Trade Secrets and Confidential Information; (b) costs of investigating unauthorized access and sabotage; (c) costs of restoring disabled workflows; and (d) attorneys' fees.

70

384. Trosper acknowledged in the Employment Agreement that "any threatened or actual violation of this Agreement or any of its terms will constitute immediate and irreparable injury to the Company." SIG has suffered and will continue to suffer irreparable harm as a result of Trosper's breaches that cannot be adequately remedied by monetary damages alone.

385. SIG is entitled to: (a) permanent injunctive relief enjoining Trosper from disclosing SIG's Confidential Information and performing Conflicting Services; (b) specific performance of Trosper's obligations under Sections 1.1, 1.2, 1.4, 4.4, 4.5, and 7; (c) attorneys' fees and costs pursuant to Section 10.2; and (d) in the alternative, compensatory damages.

**WHEREFORE,** as to Count XIV, SIG respectfully requests the following relief against Defendant Trosper: (1) permanent injunctive relief, enjoining Trosper from disclosing SIG's Confidential Information and Trade Secrets; (2) specific performance of Trosper's obligations under the Employment Agreement, including compliance with the confidentiality, non-competition, and departure obligations; (3) its reasonable attorneys' fees and costs pursuant to Section 10.2 of the Employment Agreement; (4) in the alternative, compensatory damages in an amount to be proven at trial, but at least $1,000,000.00; (5) pre-and post-judgment interest as permitted by Virginia law; and (6) such other and further relief as this court deems just and appropriate.

**Dated:**  June 18, 2026

Respectfully Submitted,

**STRATEGIC INNOVATION GROUP, LLC**
**By Counsel:**

*/s/ Laura Golden Liff*

Laura Golden Liff  (VSB #80618)
Angela M. London (VSB #93639)
Teresa Azzam (VSB #99692)
**MILES & STOCKBRIDGE P.C.**
1751 Pinnacle Drive, Suite 1500
Tysons Corner, Virginia 22102
Phone: 703-903-9000
Fax: 703-610-8686
lliff@milesstockbridge.com
alondon@milesstockbridge.com
tazzam@milesstockbridge.com

*Counsel for Plaintiff*

## **VERIFICATION**

I, Vikram Agarwal, am the Chief Executive Officer of Strategic Innovation Group, LLC, the Plaintiff in this action. I have read the foregoing Verified Complaint and know the contents thereof. The facts stated therein are true to my own knowledge, except as to those matters stated on information and belief, and as to those matters, I believe them to be true. Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on ___6/18/2026___, 2026.

DocuSigned by:

*Vikram Agarwal*
C73561031B3D406...
_____
Vikram Agarwal
Chief Executive Officer